In the Matter of the Probate of the Last Will and Testament of ELIZA A. CARTER, Deceased.

FANNIE N. BROWN and ERNEST C. GORDON, Appellants; WILLIAM C. PIKE and Others, Respondents.

Third Department, December 28, 1921.

Wills — probate — undue influence — bulk of estate given to residuary legatee who stood in confidential relationship — testatrix in feeble health and incapable of attending to business at time of execution of will — facts establishing prima facie case of undue influence — burden of proof on contestant — jury should have been charged to scrutinize evidence closely — error to refuse to charge that proponent should explain prima facie case of undue influence, that failure of residuary legatee to testify might be considered by jury, and that unfavorable presumption arose from failure of residuary legatee to testify concerning suspicious circumstances — error for court to intimate, contrary to facts, that suspicious circumstances had been explained — error to refuse to charge that, if codicil to prior will and deed to residuary legatee were drawn by attorney under instructions from residuary legatee, they were prepared by him — contest justified and costs should not have been charged against contestant.

In proceedings for the probate of a will which, after giving to the contestant, testatrix's nearest relative, $10,000, and making various bequests to other persons and to charities, gave the residuary estate, amounting to approximately $200,000, to a friend " in recognition of his faithful friendship and careful attention to me and my affairs," it appeared that at the time of the execution of the will the testatrix was seventy-five years of age, feeble and incapable of attending to business affairs; that the residuary legatee, who, as a boy, had entered her deceased husband's employ, cared for all her business interests as well as her domestic wants after her husband's death and occupied a very close and confidential relationship toward her. There was nothing to show that the testatrix comprehended the extent of her estate or that so large a sum was to go to the residuary legatee. In February, 1913, three months after the death of her husband, she executed a prior will which as prepared was entirely in typewriting with the exception that the name of the residuary legatee was left in blank and was filled in later by the testatrix, but whether before or after the execution of the will did not appear. A short time after the execution of that will an attorney acting for the residuary legatee prepared for execution by the testatrix two powers of attorney purporting to give general powers to the residuary legatee to act for the testatrix in her capacity as executrix of her father's estate and personally

and as executrix of her husband's estate. The two powers were executed by the testatrix perfunctorily and without any discussion as to their contents, meaning or effect. The powers were never recorded and the testatrix continued to sign papers as before, and the existence of the powers was not known to any one outside the parties and a bank which demanded from the residuary legatee authority for his signature of the name of the testatrix to a check. Two days after the execution of the powers of attorney the residuary legatee had his attorney prepare a codicil to said prior will which reaffirmed that will but eliminated as coexecutor the attorney who drew it and left the residuary legatee as sole executor. This codicil was executed by the testatrix without question. In March, 1914, the attorney for the residuary legatee, at the latter's request, prepared a deed from the testatrix to him of a valuable piece of real estate for an expressed nominal consideration which reserved the use of the property conveyed to the testatrix for life. The testatrix executed the deed without any explanation of its contents and it was not recorded during her lifetime.

Subsequent to the transactions outlined the will offered for probate was prepared by the attorney for the residuary legatee and executed by the testatrix. While it is claimed by the proponent that the will was prepared from a memorandum draft in the handwriting of the testatrix, that memorandum was not produced. The will in question differed from the prior will in that its changes benefited the residuary legatee solely, made larger bequests to charitable institutions, apparently to lend color, set out the reason for the gift to the residuary legatee and added a provision that he need not file any inventory. While there was nothing to indicate that the testatrix was interested in any charities or the corporations benefited by her will, it did appear that the residuary legatee was.

*Held,* that the burden of proof was with the contestant to prove undue influence, but under the circumstances stated there was presented a condition which required some further proof or explanation on the part of the proponent to free himself from the presumption of undue influence.

The court should have instructed the jury as follows: That in view of the close confidential and fiduciary relation existing between the testatrix and the residuary legatee and on account of the influence which the residuary legatee apparently had over the testatrix, they should scrutinize the evidence closely to determine if the will was the testatrix's free act;

That the trust relations and the circumstances shown made a *prima facie* case of undue influence so as to require an explanation on the part of the proponent and to require some evidence on his part tending to satisfy the jury that the will was the free, untrammeled and intelligent expression of the testatrix;

That the fact that the residuary legatee did not testify as a witness might be considered by the jury in determining whether any suspicious circumstances had been explained, for there were many important things not concerning personal transactions with the decedent to which he could have sworn;

That if the residuary legatee had evidence within his control to explain suspicious circumstances and it was material, his failure to produce it raised an unfavorable presumption as to him.

If suspicious circumstances were shown against the residuary legatee and he refused to testify, it was prejudicial for the court to intimate to the jury that the facts had already been explained in court where in fact they had not.

It was error to refuse to charge that the instructions for drafting the codicil having been given by the residuary legatee, the codicil must be regarded as having been prepared by him.

It was error also to refuse to charge that the instructions for drafting the deed from the testatrix to the residuary legatee having been given by him, the deed must be regarded as having been prepared or drafted by him, for if the deed was wrongfully obtained, it had a direct bearing on the control which the residuary legatee exercised over the testatrix and his willingness to benefit from that control.

The facts shown justified the contest and made it necessary and it was error to impose any part of the costs against the contestant.

APPEAL by Fannie N. Brown and another from a decree of the Surrogate's Court of the county of Clinton, entered in said Surrogate's Court on the 10th day of December, 1920, admitting to probate the last will and testament of Eliza A. Carter, deceased.

*Patrick J. Tierney,* for the appellant.

*Ernest C. Gordon,* special guardian, appellant in person.

*John H. Booth, Weeds, Conway & Cotter,* and *Frank E. Smith,* for the respondents.

JOHN M. KELLOGG, P. J.:

The testatrix died May 28, 1919, at the age of seventy-nine years, leaving an estate of about $280,000, which came from her father and her husband. The will was made February 9, 1915, and after giving to contestant, who was her first cousin and nearest relative, a daughter of her mother's brother, $10,000, and to each of said cousin's two daughters $1,000, and leaving bequests to certain friends and charities, her residuary estate, amounting to about $216,600 (subject, however, to the payment of several life annuities to various persons aggregating $2,300 and payment of taxes and expenses of administration), was disposed of as follows:

Third Department, December, 1921.          [Vol. 199

" *Item twenty-sixth.* All the residue and remainder of my estate, both real and personal and wheresoever situated, I give, devise and bequeath to my friend, William C. Pike, of Plattsburgh, New York, in recognition of his faithful friendship and careful attention to me and my affairs."

Undoubtedly the statutory requirements were observed in the execution of the will, and we will not question the competency of the testatrix to make a will if she knew the condition of her property and was left free in the matter. The real question is whether the will is the will of the testatrix or the will of Mr. Pike, the chief beneficiary. The contention was that by virtue of the trust and confidential relations between them, he was using her estate for his benefit and improperly imposing upon her from time to time in transactions made entirely for his benefit, and that the will is a part of a scheme he was carrying out to obtain her property by means of his power over her. It is urged that the case falls squarely within *Matter of Smith* (95 N. Y. 516) and *Matter of Kindberg* (207 id. 220). We will not pass upon the facts, but will refer to some conclusions which the jury could have found which require a reversal of the decree upon exceptions taken with reference to the charge.

Mrs. Carter was reared in luxury, well educated and of fair ability, but had no knowledge of business affairs. In 1871 she married John C. Carter. Their relations were most happy; he had the entire management of the household, her property and apparently herself. He bought her shoes and clothing, directed as to the household, and her greatest pleasure in life seemed to be to do what he wanted done, and in a business point of view, with her large fortune, she only signed papers that he presented to her for signature. He died October 2, 1912; she showed a friend a pair of shoes soon after and said they were the first she had ever bought. She stated that she had never drawn a check until after his death. She appeared only once in the bank, where she had a very large deposit, and wanted to draw twenty-five dollars or forty dollars, to meet a purchase she had made. The cashier prepared the check, she signed it and he said " we do not see you often," and she said, " I leave those matters to Mr. Carter." She told a friend Mr. Carter did everything; every-

thing he wanted she wanted; she let him decide everything. Her confidence in him was fully justified. His death was a great shock to her and it saddened and unfavorably affected her life. She felt, as she stated in the year in which the will was made, " how much better if I had gone and John had lived; he knew what we had and how they were going to use it, and what we were going to do, and here I am perfectly helpless."

Mr. Pike, as a boy, worked for her husband, and upon Mr. Carter's death he was called, made all the arrangements for the funeral, took charge of the business of the household and visited her almost daily. He was the chief factor in selecting the monument to be placed at the husband's grave. There is no doubt that he made life easy for her, attended to her every want, and perhaps she had as much pleasure in carrying out his wishes and signing papers presented by him as she did in doing that service for her husband. Apparently he did all her business; she never went to the bank after her husband's death and the bank business and the other business was entirely in his charge. She did, however, from time to time receive small sums from rents and gave receipts therefor. She depended upon him for everything. She was asked over the phone to contribute some sheets and pillow cases to the Red Cross, and to a friend present she said she would have to ask Mr. Pike about it. A woman friend ordered two gowns for her at her request, but she countermanded the order, saying that Mr. Pike would send for samples. She borrowed trivial sums of money from her friends who were calling upon her and stated she would get the money from Mr. Pike. The friend asked her why she did not go to the bank for the money and she replied, " I couldn't do that, Lucy, I never went to the bank and drew any money." She wrote a friend, " Mr. Pike is very kind; he takes charge of all my affairs just as Mr. Carter used to do, so that I don't have to do anything." She said, " Mr. Pike looks after all business matters and is also very kind and efficient about other matters pertaining to home matters, looking after coal, wood and other supplies when I cannot get about; a brother could not be more attentive. I am thankful." The residuary clause in the will speaks of his " careful attention to me and my affairs." Apparently

she had the right to trust Mr. Pike; to her knowledge he stood high in the community. He was a director and vice-president of one of the principal banks and president of the board of education, treasurer of the Young Men's Christian Association, a member and officer of the Methodist church, and was apparently a man to be trusted in every respect, and she was in a position to confide in and trust him. She was growing older, more feeble, more forgetful, living alone with her servants and less able to take care of herself. Her physician swears that she was incapable of doing business. Speaking of her condition in 1915 he says, " her sight was poor; it was somewhat weaker and it became progressively worse. She had cataracts. She could write with difficulty; it was difficult for her to read even print." From the relations existing between them, and the trust she imposed in him, he undoubtedly had the opportunity to deceive her, to occupy and control her mind for his own benefit, if he desired. Certain facts, it is claimed, show clearly that he had the desire to advantage by his control over her, and did advantage by it, and the evidence would warrant findings to that effect.

Immediately after her husband's death she drew four checks, aggregating $1,000, to the order of Mr. Pike. All other checks signed by her were drawn by Mr. Pike. Five of them were payable to the order of several other persons, aggregating $2,487.34. The other checks were prepared by Mr. Pike, payable to his order, and aggregate $66,000. The appellant contends that some $27,000 of the money so drawn by Mr. Pike remains unaccounted for. The respondent contends that some of the money so drawn and claimed to be unaccounted for was probably paid for taxes, and presents figures which, if found correct, would show that a great part of the money has been accounted for. Either computation is bad enough. The respondent's computation involves speculation and guess work. Mr. Pike could have made it clear to the jury just what he did with her money.

After Carter's death her property was not difficult to handle. It consisted of $100,000, face value, New York city three and one-half per cent registered stock, with interest payable semi-annually; $40,000 United States three per cent registered bonds, interest payable quarterly; $53,820.50 deposit

in the City National Bank of Plattsburgh, which apparently drew interest at three and one-quarter per cent, credited to the account semi-annually; $7,734.47 in the National Bank of Plattsburgh, which apparently drew interest at four per cent, credited semi-annually, and a little balance of $217.50 in the First National Bank. The homestead, which she acquired from her father, and the furnishings, were of the value of about $12,000, with the result that $213,775 was invested in a manner which required little attention. There were also certain mortgages, real estate and other property which she acquired from her father. She was executrix and sole legatee and devisee of her husband's estate. His personal property was inventoried at $17,544.26 and the real property at $20,260. Evidently the inventory of her estate shows no increase over the property she owned at her husband's death, together with his property. Her income from all sources probably was about $9,000 per year. An examination of the deposits in the banks, between the husband's death and the date of the will in question, shows that aside from the interest on the New York stock, the government bonds and the bank accounts, the deposits aggregated $11,553.20, most of which, we gather from respondent's brief, were payments on account of principal obligations or lands sold. A comparison of the inventories of the husband's estate and her estate shows that none of his personal property remained undisposed of, with a minor exception. Various deeds were given and mortgages assigned and discharged. It is evident that much of the moneys of Mrs. Carter, both on account of interest and principal, did not reach her bank account, and it also appears that Mr. Pike, from time to time, was drawing checks upon his private bank account to make payments for her. From his position, he must be a good business man, and it is inconceivable that he would have received and disbursed her moneys without passing them though her bank account unless he kept a strict and accurate account of them himself. We must assume that he is able to give details and particulars showing whether or not he has fairly accounted for the moneys and property in his charge, but for some reason he has neglected to give the information. Having given some information as to the reinvestment of certain moneys, we have the right

to assume that he has given all the information which it is for his interest to give.

October 5, 1912, she began to keep a cash book in which she placed her receipts in one column and her expenditures in the other. The expenditures always exceeded the receipts, and the book gives a very fair view of her want of business ability and experience. From that time until the making of the will in question she records receipts amounting to about $1,516, and expenditures of about $5,886. Five hundred and ninety dollars and forty-seven cents of the receipts were from Mr. Pike, in small amounts; the balance was for rents or matters not named. The expenditures were for the general expenses of the household, the servants, groceries, provisions, work upon the place, clothing, and apparently were the general expenses of the household and improvements on the place. If the account is at all reliable she must have lived in a manner entirely out of keeping with her circumstances, while her business man was using large sums of money for purposes undisclosed. It is not surprising that she expressed regret to a friend that eggs were selling so high that she could not buy them and that she could not afford to keep up her grounds in the manner she would like. If we disregard the receipts mentioned in the little red book, her cash book, and consider that the total expenses paid by her were received from income, it leaves a large part of the annual income unaccounted for. Taxes and coal bills may account for a part of it; Mr. Pike had it in his power to show the facts.

Mrs. Brown, the contestant, and her children often visited the testatrix, and their arrival was an event in the family. Mrs. Carter also visited her in Vermont, and had great affection and great interest in her, as she was her nearest relative, and she stated how glad she would be to have Mrs. Brown come and live with her, but of course Mrs. Brown owed her duty to her family.

There is nothing in the case to show that at the time of the making of the will in question the testatrix knew that she had a large fortune and realized the manner of its investments or the income it would produce. We have seen that she felt cramped for money and lived in a very small way. Did she realize that by the residuary clause she was giving

away nearly $200,000 in money to a man who was no blood relative of herself or her husband? If the amount had been mentioned in the will, there would be some right to say that she understood it. The form of the gift conceals the amount. The attorney asked her, when he drew the will, if there was enough of her estate to pay the legacies and she said there was ample. He made no further inquiry and she made no further statement. She had nothing to do with the large principal of her estate; she had only small sums doled out to her by Mr. Pike. She was growing older, more feeble, more forgetful, less able to take care of herself. It is said that when she wrote the three checks, immediately after her husband's death, she must have seen from the memorandum on the check book that there was some fifty odd thousand dollars in the bank. With her limited business experience, there is no assurance that she comprehended it, and even if she did see it, it gave her but little information. It is said she was present at the inheritance tax assessment; but Mr. Pike was principally in charge and it probably meant but very little to her. The form of the wills, the disposition of the bulk of the estate in the residuary clause, and the many facts shown in this case, require some suggestion that the testatrix, at the time of making the will, had some knowledge of the amount of her estate.

Four important transactions stand out and give much color to the appellant's contention that Mr. Pike was using his fiduciary and confidential position to absorb her fortune, and was doing it with apparent success. They bear directly upon his intent and upon the question whether his mind was controlling her's.

(1) The Smith will, so called. Nine days after her husband's death Judge Booth drafted a will for Mrs. Carter, which was executed. Its contents do not appear. February 3, 1913, a little over three months after her husband's death, the Smith will, so called, was executed. It was prepared some days before. Mr. Smith, who drew the will, is an able, painstaking, conscientious lawyer. The will was typewritten, but as prepared, the name and residence of the residuary legatee and devisee were left in blank. On February third the will was executed by the testatrix, at Mr. Smith's office, in

the presence of the subscribing witnesses, Mr. Cotter, one of Mr. Smith's partners, the stenographer of the firm and Mr. Larkin, the brother-in-law of Mr. Pike. Mr. Smith was at the office. The will, as it now appears, has the name of William C. Pike, of Plattsburgh, N. Y., written in the residuary clause in the handwriting of the testatrix. There is nothing to indicate why the blank was left when the will was prepared. It is suggested that perhaps the original plan, before Mr. Smith was seen, was to have the will executed with the name in blank, or that Pike, not being present, his influence over the testatrix became lessened and she was not ready to name him as residuary legatee in place of her nearest relative. Perhaps the matter was discussed between the testatrix and Mr. Smith, and he deemed it his duty to his client not to sign as a witness. It is also suggested that the presence of the brother-in-law enabled the testatrix to name the beneficiary. The only witness who is sworn upon the subject is the brother-in-law, and he cannot tell whether or not Mr. Pike's name was in the residuary clause when the will was executed, but volunteers the statement that the pen and the ink seem to be of the same kind as the other signatures. The proponent put Mr. Cotter upon the stand and asked him what occurred at the execution, and the court suggested that the will was in evidence, its draft, and one of the witnesses had testified as to who wrote the name of the residuary legatee. It was proved, and concededly is a fact, that Mr. Pike's name was written in the will by Mrs. Carter, but there is no evidence to show whether the blank was filled before or after the execution of the will. The brother-in-law told Mr. Pike a few days after that a will had been made. He cannot swear that Pike's name was in the will at the time of its execution, and that may have caused Pike to feel that the will might not stand.

(2) The powers of attorney. May 19, 1913, a few days after the Smith will was executed, Mr. Pike went to his personal attorney, who apparently had never acted as attorney for Mrs. Carter, and told him that she wished him to prepare powers of attorney to him, and directed that the powers given be as broad as possible, and the attorney prepared, without consultation with Mrs. Carter, one power of attorney, as

executrix of her father's estate, and another power of attorney personally and as executrix of her husband's estate, giving Mr. Pike general powers to act for her. The attorney was conscious that she could not grant full power as to the two estates; nevertheless he made the instruments as Mr. Pike wanted them and handed them to Mr. Pike, and later in the day went to the house of Mrs. Carter where these powers of attorney and three assignments of mortgages were laid upon the table and the powers of attorney were signed in his presence. He is not sure whether the other three papers were then signed, or had previously been signed, but all the papers were acknowledged before him at the same time. There was no discussion as to the contents, meaning or effect of either paper. The attorney had no knowledge that she knew she was executing powers of attorney. He did not charge his services to her or to Mr. Pike, has no recollection of her paying for it, but thinks he was paid. Mr. Pike paid him for all other services rendered in behalf of Mrs. Carter and undoubtedly paid for this work. The powers of attorney were papers intended to take effect during the lifetime of the parties; they were never recorded during Mrs. Carter's lifetime and she continued to sign papers as before. Apparently no one ever saw them until in 1918 she fell and broke her hip and then Mr. Pike signed her name to checks and the bank asked him to show the powers of attorney, which he did. There is no evidence that any one else ever saw them or heard of them during her lifetime.

This transaction falls within the condemnation of *Matter of Smith* (95 N. Y. 516) and *Matter of Kindberg* (207 id. 220, and the cases there cited). The powers of attorney were invalid and may be considered the act of Mr. Pike rather than the act of Mrs. Carter. We quote from the *Smith* case: " This rule does not proceed upon a presumption of the invalidity of the particular transaction, without proof. The proof is made in the first instance when the relation and the personal intervention of the party claiming the benefit, is shown." There is no evidence explaining this transaction and no evidence in the case that Mrs. Carter ever understood that she had given the powers of attorney. As it stands the transaction must be treated as fraudulent in law and void.

(3) The codicil to the Smith will. May 21, 1913, two days after the powers of attorney had been successfully obtained, a codicil was added to the Smith will. Mr. Pike informed his attorney that Mrs. Carter desired to make a codicil eliminating Mr. Smith as executor from the so-called Smith will, and leaving him the sole executor. The attorney did not examine the Smith will to see what powers the executors had, or how they must exercise them. He prepared the codicil as Mr. Pike directed and gave it to him. A few days later Mr. Pike brought Mrs. Carter to the office and left her at the door. She executed the codicil, the attestation clause being read in the presence of the witnesses, and it was witnessed by the attorney and Mr. Pike's brother-in-law. It was attached to the Smith will. This transaction, as it stood, falls under the same condemnation as the powers of attorney. Mr. Pike attempts to relieve himself from this condemnation by putting in evidence a statement, in the handwriting of the testatrix, as follows: " Sabbath Evening, *Oct.* 12, 1913.

" I wish to explain the reason of the change in the appointment of the executors of my will. When Mr. F. E. Smith was chosen, I thought that he *alone* would be concerned in it, when on sending in the bill for drawing the will I found that the entire firm of Weeds, Conway and Smith were concerned in it. I withdrew Mr. Smith's name and let Mr. Pike's name remain alone. " (Signed) ELIZA A. CARTER."

There is no evidence when this paper was prepared; all we know about it is its production by Mr. Pike on the trial. The contention is that after the codicil was made some one thought that the removal of Mr. Smith and leaving the entire matter to Mr. Pike might call for criticism and perhaps affect the validity of the will, and this paper sought to remove objection on that point; possibly it might have been thought that Mr. Smith had peculiar knowledge about the original will, and the blank he left in it, and that it was unwise to have any friction with him, and that the explanation made in the paper would satisfy him; that it is not probable that an old woman, with the little business experience and knowledge of Mrs. Carter, would have thought of such a paper months after

App. Div. 405]     Third Department, December, 1921.

the codicil was executed; that the reason she gives is entirely insufficient; that if she had been treated fairly, her adviser would have said, You knew that Mr. Smith was a member of the firm and you knew that Mr. Cotter, his partner, attended to the execution of the will; you knew it was a firm matter, and the fact that Mr. Smith is a member of the firm should not cause his removal; that a reason was wanted and that this was the only one which could be given without offense to Mr. Smith. The codicil reaffirmed the Smith will, and it may have seemed that it cured any defect in it, if there was a defect.

(4) The deed from Mrs. Carter to Mr. Pike. March 14, 1914, Mr. Pike requested his said attorney to draw a deed from Mrs. Carter to him of some land in or near Plattsburgh, worth $11,500. The attorney prepared the deed without any conference with Mrs. Carter; the consideration is stated at one dollar and other valuable considerations. The deed reserved the use of the property to Mrs. Carter for her lifetime. He delivered the deed to Mr. Pike and afterwards he called on Mrs. Carter and she executed it. He made no explanation to her with reference to it. He says that she said she had had it in mind for a long time and that she wanted the matter closed and disposed of; that Mr. Pike had been very good to her and that she asked him to deliver it to Mr. Pike, which he did. Her statements to the attorney would indicate that she understood she was transferring some property to Mr. Pike for his services, but she conveyed no information as to its value. So far as he knew she might have thought that she was conveying some little piece of real estate worth a few hundred dollars. If she had seen the consideration in the deed, " one dollar," it would have conveyed no information to her mind what was being conveyed. She was executing deeds, papers and checks at his request. If she had read the deed, with her small knowledge of business affairs, it is quite improbable that she could have located the premises as the most valuable real estate she had. The deed was not recorded during her lifetime, and shortly after its execution a party applied to her to purchase a part of the property conveyed; she replied that she did not want to sell

it, but if she ever did want to sell it he should have the first chance to buy. This indicates, it is claimed, that she had no knowledge that she had given away the property. Why was the transfer made? The property had already been given to Mr. Pike under the Smith will, which would take effect at her death, and the reservation of the life estate gave him no use of the property until her death. Did he still have some lingering doubt about the Smith will? And did he mean to secure so much property any way? The attorney says that he considered that he did the business for Mr. Pike's benefit; he did not charge it to Mrs. Carter but to Mr. Pike and he paid for it. This transaction, it is urged, falls within the condemnation of the cases we have cited, and it is said that the powers of attorney, the codicil to the will and this deed were all the work of Mr. Pike's attorney, at his request, at his pay and for his benefit, and that Mrs. Carter merely signed her name as requested. It is urged that the three instruments were obtained under circumstances from which the law implies a fraudulent intent on the part of Mr. Pike, and that they require explanation in order to give them validity.

We now come to the will in question, the bill for which was made out in Mrs. Carter's name, rendered to Mr. Pike and paid for by his personal check. The attorney swears that some one, he cannot tell who, arranged with him that Mrs. Carter was to be at his office. His version of the transaction is that she came alone. She brought with her a will which she said she had prepared; she said she had made a will which she was dissatisfied with in some respects, because some parts of it seemed rather peculiar, and there were some changes she wanted to make. She wanted him to look at the paper she had produced and tell her if it was all right and in proper form for her to execute as her will. He looked it over and told her there were some things that he thought should be changed as to wording. They talked the matter over some and then she asked him to draw her will from the paper which she had produced and the suggestions they had made, and it was understood that she was to call at a future day when the will would be ready for execution. He dictated from the paper she produced to his stenographer, and says that he kept the stenographer's first draft of the will, which

was put in evidence. His attention was called to the fact that the will as first drafted by the stenographer does not provide for a trust fund; he then says that he withheld that part from the stenographer, as he wanted to give it some further thought. Concededly the will, in most respects, is taken from the so-called Smith will; the only material difference is that some bequests to institutions and to some individuals were slightly larger than in the original will. The Smith will was silent as to the cause of the gift to Mr. Pike, while in the present will it is in " recognition of his faithful friendship and careful attention to me and my affairs." The Smith will provided a trust fund to be made up of New York city bonds, or government bonds, of $85,000, to meet the annual annuities of $2,300, with the right to withdraw from the trust fund as the annuities drop out. The present will reduces the trust fund to $40,000. The Carter idea of investments always had been the highest security and, therefore, a small rate of interest. Mr. Pike's investments showed a change; he bought less reliable securities, drawing a greater rate of interest, and of course it was not necessary to have a fund of $85,000 to pay $2,300 in annuities if it would earn six per centum. Who changed the Carter idea as to investments? The contention is that it does not seem that Mrs. Carter would have desired this change; it was solely in the interest of Mr. Pike. To the will was added a provision that so far as may be he need not file any inventory. It is claimed that he did not want it known what he received under the will, and perhaps wanted no comparison between the moneys he took from her and the original estate as it existed when he succeeded Mr. Carter in its management, and it is suggested that the small additions to the legacies were made to give color to the change. And right here a significant fact appears — the little red book may be searched in vain to find any charities which Mrs. Carter was interested in. During its entire time we find no entry that could relate to a charitable gift except a trivial matter of a very few dollars. We cannot find that she was interested in any of the corporations benefited by her will. Mr. Pike and his attorney were both officers of the Methodist church, which received quite a legacy, and Mr. Pike was interested more or less in other charities. There

is no evidence that she had any interest in these charities during her lifetime, from which it is urged that the charities were inserted in the will to give it a local color and interest, and to divert the public mind from the fact that Mr. Pike was the sole beneficiary. The will was executed by the attorney and brother-in-law as witnesses; they say the attestation clause was read to her; the attorney says he read the will to her. He handed her the will and the original will or memorandum which she brought with her and from which he made the will. Mr. Pike produces the will but the memorandum has not been produced. This was a piece of evidence which, if found to be in her own handwriting and to agree practically with the will, would have been good evidence. Mr. Pike controlled the safety box in the bank and the safe at the house; she had not the strength to open the house safe. Why was not the memorandum produced? The attorney says that he had seen her write her name to the codicil, to the powers of attorney, to the deed and some other papers, but had only seen her signature. He thinks the paper she produced was in her own handwriting. · It is urged that there can be but one of three reasons why the original draft of the will was not produced:

(A) Perhaps it shows that it is not in her handwriting and that the attorney who only had seen her write her name was mistaken. She might well have said she prepared it if it had been written by Mr. Pike or some one at his dictation, or with his assistance. (B) The attorney says that he is sure there was a provision in the original draft about a trust fund, but he cannot tell what it was. He gives no intelligent statement of any discussion between him and the testatrix about the trust fund and the framing of it in its present form which only benefited Mr. Pike. Was the trust fund entirely omitted from the original will as the stenographer's draft would indicate? And did the attorney, in comparing it with the Smith will, feel that it was taking too many chances and that it would be wiser for Mr. Pike to have the trust fund reformed and inserted? He was asked if he had seen Mr. Pike between Mrs. Carter's two visits at his office and he cannot remember. (C) There is also a possibility that Mr. Pike and his representatives may have forgotten to produce

the paper.  It cannot be that it was lost when the memorandum as to the codicil and other papers not relating to the will itself are found.  The attorney swore that he did not know who made the original appointment with Mrs. Carter. He was asked, " Was it Mr. Pike?  A. I don't know.  Q. It might have been Mr. Pike, couldn't it?  A. Quite probably, it might have been him or anybody else.  Q. Had anybody other than Mr. Pike ever talked to you about any business of Mrs. Carter's before that day?  A. I am not certain about that."  Perhaps this testimony was not entirely frank.  Two facts stand uppermost:  Mr. Pike was competent to swear whether he made the original arrangement as to the preparation of this will.  He could have shown whether he discussed with the attorney the trust fund or any provision with reference to this will.

It is urged that the attorney was careless in protecting the interests of Mrs. Carter, if he considered her his client, in the matter of making the deed to Mr. Pike, the powers of attorney and the codicil to the Smith will; that it is quite evident that he did not consider himself as acting as the attorney for Mrs. Carter; he expected Mr. Pike to pay him and Mr. Pike did pay him; that he did not exercise the care which an experienced attorney would exercise for the protection of a feeble old woman who was conferring benefits upon the man who stood in the closest confidential and trust relations to her and was managing her affairs and that the manner in which these matters of business were transacted, the connection of the attorney with them, and his testimony, raised a fair question as to what effect should be given to his testimony; that the fact that he did not closely scrutinize and guard the rights of Mrs. Carter, with other facts, might be considered as impairing his credibility.  His credibility was a question of fact for the jury.

On the 11th of August, 1916, Mrs. Brown, the contestant, had an interview with Mr. Pike and told him that Eliza (meaning Mrs. Carter) had agreed August eighth, when she paid the $1,500, that the remaining $200 on the note was to be given to her, to which he replied, in substance, " we are giving you the interest on this and that is a great deal."  She gave him a check for the $200 payable to Mrs. Carter's order.

The check was indorsed by her and apparently deposited in the bank by Mr. Pike. Here he apparently nullified a gift made by her to her nearest relative and she acquiesced in it.

It is urged that Mrs. Carter appears to have been under the control and power of Mr. Pike; that she had no one representing her interests or caring for her. The question comes up, under all the circumstances, was this her will or his will? Did his mind control in the making of it, or was the will the product of her mind uninfluenced and unbiased by the relations which he had towards her? As we have said, the important question is, has the fiduciary and the managing mind shown that the will was the free, untrammeled and intelligent expression of the wishes and the intentions of the testatrix? The burden of proof of course is with the contestant to prove undue influence, but all these facts, if proved, present a condition which requires some further proof or explanation on the part of the proponent. (See above cases.)

With the statement of facts which might have been found we come to the charge, which is able and well covers the ground of an ordinary will contest. We do not find in it any reference to the fact that the jury must closely scrutinize to see if the will was the testatrix's free act on account of the close, confidential and fiduciary relations existing between the parties and on account of the influence which Mr. Pike is shown to have had over her, or any suggestion that such relations and the other facts shown required any explanation. The crucial question upon which the case must turn was not presented to the jury in a way to enable it to act with the intelligence which the situation required. The contestant asked the court to charge the jury: (1) That it appearing that the relations between Mrs. Carter and Mr. Pike were confidential and fiduciary, that the will was prepared by Mr. Pike's attorney, witnessed by his attorney and his brother-in-law, paid for by him — that this is a circumstance which requires explanation on the part of the proponent, and that the burden is on the proponent to satisfy the court and jury that the will was "the free, untrammeled and intelligent expression of the wishes of Mrs. Carter," to which the court replied, in substance, that the general rule applied to probate cases does not mean that the burden of proof is upon the proponent to show

freedom from undue influence; that it seems that if the contestant has made a *prima facie* case, or an apparent case where there was undue influence, then of course the other party must make answer to it, and if the jury should find that the circumstances are such as to cause them to believe that there was undue influence exercised, upon the proof before them, that then it is for the other party to furnish proof meeting that and overcoming it, but the burden of proof did not change. The counsel excepted to the charge as made and to the refusal to charge. Counsel did not ask a charge as to the burden of proof; he, in effect, urged that the trust relations, and the circumstances shown, made a *prima facie* case so as to require an explanation on the part of the proponent and to require some evidence on his part tending to satisfy the jury that the will was the free, untrammeled and intelligent expression of the testatrix. The request can be criticised, but the substance is clear. A charge was wanted that there was evidence which raised a presumption in the case which should be met or explained, and the judge refused to charge that. If the request was not correct in form, it was sufficient in substance to require the court to give instructions upon the questions foreshadowed by it. The charge as made, in answer to the request, in view of the facts and the contentions of the parties, was confusing to an ordinary jury.

(2) That the fact that Mr. Pike did not testify as a witness may be considered by the jury in considering whether any suspicious circumstances have been explained. " The Court: I think I will not charge that; of course Mr. Pike could have been called as a witness, but he could not have testified." The contestant excepted. This was clearly error; there were many important things which he could have sworn to if the facts warranted it. Many circumstances required explanation, as to which he was a competent witness.

(3) That if Mr. Pike had within his control evidence to explain any suspicious circumstance, and that evidence was material to the issue, his failure to produce the evidence raises an unfavorable presumption as to him. " The Court: I don't know that he has any evidence; I don't know how I can say that he has any. Mr. Tierney: I say, if he has. The Court: You examined him. Mr. Tierney: It is not in this

Third Department, December, 1921.            [Vol. 199

record and is not before the jury.   The Court: It was before me, I can take judicial notice of it.   Mr. Tierney: I except to the statement and except to the refusal to charge."

Clearly, the attorney being unable to say whether or not Mr. Pike asked him to draw the will in question, Mr. Pike could have sworn upon that subject.   He could have explained for what purposes he used the various checks drawn in his favor and which remain unaccounted for, and what he did with the moneys which never reached the bank, thus showing that he was acting in good faith towards the testatrix and that he was not systematically wronging her.   This bore upon his intent to defraud and her inability to take care of herself as against him.

We infer from the briefs, and the remarks of the court, that an examination of the proponent was had before trial. The presiding judge did not know the evidence taken, but whether he did or not, it was no part of the trial.   If suspicious circumstances were shown against Mr. Pike, and he refused to go on the stand, it was error for the court to make a suggestion to the jury which might cause it to believe that the facts had already been explained in court and, therefore, no further explanation was necessary.   The ruling in both respects was wrong.   Needless to say, the court could have had no such intention, but clearly the remarks were prejudicial.

(4) That the instructions for drafting the codicil having been given by Mr. Pike, the codicil must be regarded as having been prepared by him.   The court refused to so charge and exception was taken.   I think, as a matter of substance, that it made no difference whether he wrote the codicil or told his attorney how to write it.   The charge was erroneous.

(5) That instructions for drafting the deed from Mrs. Carter to Mr. Pike, in March, 1914, having been given by him, that that deed must be regarded as having been prepared or drafted by him.   " The Court: I do not think that is in this case at all."   The contestant excepted.   We have the history of this deed and the refusal to charge was prejudicial.   If the deed was wrongfully obtained, it had a direct bearing on the control which Pike exercised over the testatrix and his willingness to benefit from that control.

If, as the contestant contends, the powers of attorney, the

deed to Pike and the codicil to the Smith will were really the act of Pike and not those of Mrs. Carter, if he overreached and defrauded her in those respects, it would be clear that the present will should not stand.

Why was the will made? The appellant answers that the attorney says that Mrs. Carter told him, when she produced the draft of this will, that she was dissatisfied with her will because some parts of it seemed rather peculiar and there were some changes she wanted to make; attention has not been called to any parts which she deemed peculiar. The changes made were solely for the benefit of Mr. Pike, with small changes in bequests which would give some color to the new will. It reduced the trust fund from $85,000 to $40,000; it intended to excuse him from filing the inventory, so that the amount of the gift to him could not be ascertained and so that no comparison could be made between the property left by her and the property she had when Mr. Pike took control. It had the added clause that the gift to Mr. Pike was " in recognition of his faithful friendship and careful attention to me and my affairs." That might have been deemed important as a reason for so large a gift. The appellant infers that Mr. Pike was suspicious about the Smith will (1) because the name was not in the original draft and (2) the brother-in-law was not sure that his name was in the will when it was executed. He had obtained a codicil taking Smith's name out of the will and reaffirming and republishing the will itself, which seemed at the time to remove any question about the Smith will; but Mr. Smith might be unfriendly, and perhaps he had dangerous knowledge. He had been taken out of the will, and Mr. Pike may have thought it wise to take the will out of the Smith office and to have real friends for witnesses. Without passing upon these questions, or the merits of the controversy, we may say that the facts shown justified the contest, and made it necessary, and that it was error to impose any part of the costs against the contestant. The decree should be reversed upon the exceptions, and the questions retried before a jury, with costs to the appellant to abide the event.

WOODWARD, COCHRANE and KILEY, JJ., concur; COCHRANE, J., with a memorandum; WOODWARD and KILEY, JJ., vote to

reverse on the further ground that the verdict on the question of undue influence was against the weight of the evidence; H. T. KELLOGG and VAN KIRK, JJ., not sitting.

COCHRANE, J.:

I concur in the result on the sole ground that the jury were not sufficiently instructed as to the effect on the evidence of the confidential business relations between the decedent and her chief beneficiary. I do not, however, indorse all the arguments or suggestions of the presiding justice. Those arguments were proper considerations for the jury and they have passed on them adversely to the appellant. The vice is that in doing so they did not properly appreciate the necessity of an explanation by the proponent satisfactory to them that the will was the free and intelligent expression of the wishes of the decedent. Justice, therefore, requires a new trial.

Decree reversed upon the exceptions taken, and ordered that the questions be retried before a jury, with costs to the appellant to abide the event.