In the Matter of the Estate of RUTH ELLA FORSYTH, Deceased.

Surrogate's Court, New York County, December 28, 1938.

*M. Michael Edelstein*, for the petitioner.

*Breed, Abbott & Morgan [William C. Breed, Jr.,* and *Hugh S. Williamson* of counsel], for the Old Colony Trust Company, Ruth Adams and Hester Adams Huhne, contestants.

*Richard T. Guerin*, for Kenneth Pomeroy, contestant.

*Charles J. Rodgers*, for George Flood, contestant.

*J. Leonard Stoll*, special guardian.

*John J. Bennett, Jr., Attorney-General [Robert P. Beyer, Assistant Attorney-General*, of counsel], for the State of New York.

FOLEY, S.  This contested probate proceeding was tried before the surrogate without a jury.  It presents unusual circumstances not customarily met in the trial of the validity of a will.  Mrs. Forsyth signed the paper offered for probate on November 23, 1933.  Her husband had died several years before.  No relations of her blood have been discovered.  She left an estate which approximated $100,000.  She had previously executed a will on May 23, 1916, in which she made dispositions to many legatees, consisting of relations of her husband, friends, employees and charitable corporations.  Four codicils were subsequently made by her with varying modifications of her original dispositions.  The last codicil was executed on August 6, 1928.

The chief contestant here is the executor named in the prior testamentary instruments.  The principal attacks upon the validity of the propounded paper are that the testatrix was of unsound mind at the time of execution and that the will was the result of the undue influence of James Calder named in it as the residuary legatee.  In place of the numerous legatees mentioned in the prior instruments, the paper involved here made only three pecuniary bequests aggregating $6,500.  The benefit to Calder, if the contested paper was admitted to probate, would approximate $90,000.  Under the prior will and codicils, he was a legatee to the extent of $30,000.

Mrs. Forsyth had resided for many years at the Hotel Plaza in this city.  She became a guest there in the year 1924.  Until the close of the year 1932 she appeared, from the testimony, to have lived the normal life of a person of her years, affected only by the ordinary diminishment of powers due to advancing age.  In the early part of 1933 it has been shown that a fundamental change occurred in her mental and physical condition.  She became ill in February of that year and was attended from time to time thereafter by two reputable physicians, Dr. George Bolling Lee and his associate, Dr. Joseph Nash.  In February of 1933 Dr. Lee found her suffering from high blood pressure and myocarditis.  Her answers to the physician's questions were incoherent and not responsive.  She was untidy and filthy in her personal habits and without control of her bodily functions.  At the urging of her physician, she entered the Polyclinic Hospital in this city and remained there for five weeks.  She left it on April 24, 1933, to return to the hotel.  Her condition upon entrance into the hospital was diagnosed as hypertension, neurasthenia and arteriosclerosis.

Her memory was impaired, her speech incoherent and her capacity for orientation lacking. On November 18, 1933, five days before the execution of the will, she suffered a paralytic stroke. Dr. Nash was called to attend her and found evidence of the paralysis. Her mental condition was confused and blurred. Her blood pressure was extremely high. On the following day her condition was slightly improved, but the blood pressure was still high and the confused mental state still continued.

With this background of her condition, the exceptional circumstances surrounding the making of the will become important. Calder, the principal beneficiary under it, brought her, on November twenty-third, in an automobile, to the office of an attorney in Montclair, N. J. The attorney had never known Mrs. Forsyth before that day. On the other hand, he had been a friend of Calder for many years. Moreover, Calder had been a client of his office for twenty-five years. Mrs. Forsyth remained in the automobile outside of the building in which the lawyer's office was located. Calder, it was testified, brought with him a slip of paper containing the alleged directions of the testatrix for inclusion in her will. These instructions, according to the testimony of the draftsman, were dictated to a stenographer and the will was typewritten. Mrs. Forsyth was then brought up by Calder to the office and the typewritten draft of the will was read to her. She is purported to have said that a mistake had been made in carrying out her instructions and that two legacies, one of $500 and one of $1,000, had been given in the instrument to the wrong persons. She thereupon directed that the amounts to these two legatees be reversed. It is also claimed that she directed the writing in of a clause expressing the reason for her large disposition in favor of Calder. Thereupon the will was changed, retyped, read by her and executed by herself and the subscribing witnesses in the form required by our law. There is another exceptional circumstance arising out of the transaction. The memorandum, which was supposed to contain her directions, has been lost or destroyed. If it ever existed and had been produced on the trial, it would have afforded support of her knowledge of the contents of the will and her possession of testamentary capacity. (*Matter of Carter*, 199 App. Div. 405.) The decedent at the time of the execution was seventy-five years old. Calder was her junior by at least twenty years. He had known her for several years. He had been an expert tennis player and had been active in a prominent tennis club in this city. He appears to be a man of moderate means. His association with Mrs. Forsyth was merely friendly. From time to time he dined with her, went on short automobile trips and took her to the tennis

championships at Forest Hills over a period of years. The evidence discloses no special affection or other reason for the large bequest given to him in the will.

With this *résumé* of the facts, the question presents itself as to whether Mrs. Forsyth was of unsound mind on November 23, 1933, the day she made her will. The surrogate finds that the proponent has failed to establish that she possessed testamentary capacity on that day. In the period after execution, in April, 1934, she was attended again by Dr. Lee and Dr. Nash. Later in that month a conservator of her property was appointed by a probate court in Massachusetts. The status of such person is the equivalent of our committee of the property of an incompetent. In October, 1934, Calder began a proceeding in the Supreme Court of Bronx county for her adjudication as an incompetent. In December of that year, upon an inquisition of a sheriff's jury, she was found incompetent. That inquisition was subsequently confirmed by appropriate orders of the Supreme Court. A committee of her property was appointed. She was then placed in a sanitarium, where she died on April 1, 1938.

There is ample proof of the unsoundness of mind of Mrs. Forsyth on the date of the making of the will. Several persons connected with the Hotel Plaza testified to her acts and declarations during the period from January, 1933, to some months after the date of the will, when she finally left the hotel. Such acts and declarations impressed them as irrational. The testimony of the registered nurse, Mrs. Stafford, was particularly convincing as to the severe impairment of the mental faculties. All of these witnesses were shown to be disinterested. On the proponent's side of the case, the testimony of the witnesses was unimpressive. Some of them plainly testified to transactions in the year 1932, or in prior years, and attributed them as having occurred in the year 1933. The evidence of the attending physicians, Dr. Lee and Dr. Nash, is entitled to great weight. Moreover, it is extremely significant that the expert psychiatrist, who testified for the proponent, stated that, in his opinion, Mrs. Forsyth was incompetent on November eighteenth and nineteenth, but competent on the date of the will, four or five days later. He had never seen her in his lifetime. With her confused mental condition, as testified to by Dr. Nash, it is inconceivable that she could have regained the mental strength, which the law requires, within such a brief period. The conclusion of absence of soundness of mind necessarily follows.

Upon the other phase of the proceeding, the surrogate is of the opinion that the propounded instrument was executed by reason of the undue influence of Calder. His appearance on the stand

was that of a dominant and resolute individual. He had been the chief actor in the preparation and drafting of the will from which he derived such a large benefit. He selected the draftsman and brought the testatrix in her weakened mental and physical condition to the office of the attorney in New Jersey, where the will was executed. The facts here are distinguishable from those cases in which a mentally or physically infirm testator personally selects a draftsman of the will, gives the instructions and performs the testamentary act without the presence of the person charged with coercion. *Matter of Ruef* (180 App. Div. 203; affd., 223 N. Y. 582) is typical of the situation where the draftsman was freely chosen by the testator.

In the present proceeding the maxim *qui se scripsit haeredem* applies to the motives and active participation of Calder. The burden of proof in such a case still remains upon the contestant, but a duty of scrutiny by the trier of the facts and a duty of explanation on the part of the beneficiary arise. (*Matter of Carter*, 199 App. Div. 405; *Matter of Putnam*, 257 N. Y. 140, affg., 135 Misc. 311; *Matter of Smith*, 95 N.Y. 516; *Tyler* v. *Gardiner*, 35 id. 559; *Delafield* v. *Parish*, 25 id. 9.) There is credible evidence in the record given by the witness Flood, who was the chauffeur for Mrs. Forsyth for many years, that Calder solicited Flood's assistance in procuring the making of a will which would give all her property to Flood and himself. The expert psychiatrist for the proponent testified that, in his opinion, Mrs. Forsyth's mind had been weakened to a degree which would make her more susceptible to undue influence.

The facts here are extremely similar to those in *Matter of Carter* (199 App. Div. 405).

The hurried execution of the propounded instrument and its very large benefits to Calder stand out in contrast with the five previous testamentary instruments which show deliberate and careful design on the part of the testatrix for the disposition of her property.

Here all the controlling facts, the enfeebled intellect, old age, change of testamentary intent and the manner of preparation and execution, point to one inevitable conclusion. When the antecedent and surrounding circumstances are grouped in their proper relation they carry to the conscience and judgment of the court the clear conviction that when Mrs. Forsyth made her signature, she was executing not her own will but one which represented the wishes of Calder. " It is no sufficient answer * * * that the testatrix was aware of the contents of the instrument and assented to all its provisions. This was the precise purpose, which the undue

influence was employed to accomplish." (*Tyler* v. *Gardiner*, 35 N. Y. 559, 595.)

The surrogate finds, upon the evidence, that the contestants have established that the paper executed by Mrs. Forsyth was procured by the coercion of Calder. (*Matter of Anna*, 248 N. Y. 421; *Matter of Carter*, 199 App. Div. 405; *Matter of Wood*, 253 id. 78; *Tyler* v. *Gardiner*, *supra; Delafield* v. *Parish*, *supra; Matter of Smith*, *supra.*)

Tax costs and submit decree on notice denying probate.