Burke, J.
The decedent, an incompetent, executed a will 16 months before her death, in which she bequeathed her residuary estate to her sister, the proponent. The family of *51 the decedent consists of her sister; three brothers residing in Germany; a predeceased brother; four nephews, three of whom reside in this country and two nieces, both residing here. One of the nephews filed objections to the probate of the will, alleging, inter alia, that the will was the product of undue influence.
The jury has found that the will was procured by undue influence. Motions for a directed verdict and for a new trial were denied. The decree entered denying probate has been affirmed by the Appellate Division.
The sole question for our consideration is the sufficiency of the evidence bearing on the issue of undue influence.
Katherine Walther, a spinster, aged 84 at the time of her death, lived in solitude in an apartment above stores in a building owned by her in the City of Syracuse. Distressed by the squalid condition of the apartment and her lack of cleanliness, her sister and brother-in-law arranged for a physical and mental examination by three physicians. After the examination the doctors recommended her removal to a nursing home. On November 8, 1951, pursuant to court order obtained on the application of her sister, Mrs. Barnard, the decedent, over her protests, was removed from her apartment and taken to a private nursing sanitarium. In February, 1952 testatrix was declared incompetent and Mrs. Barnard was appointed committee.
Prior to her death in June, 1954, the decedent was lodged in the sanitarium during the following periods: November 8, 1951 to February 22, 1952; May 3, 1952 to July 2, 1952; January 14, 1953 to February 6, 1953; and November 28, 1953 to December 21, 1953. In the intervening periods she was cared for by her sister and brother-in-law in their home.
While at the nursing home she received essentially custodial nursing care. Although she initially objected to such treatment, she was thereafter a co-operative patient and responded to care. The decedent repeatedly voiced a desire to return to her apartment, but the attending physicians advised against such an arrangement, basing their judgment in part upon their diagnosis of senile psychosis.
Although some friends of the decedent were denied entry to the sanitarium at the Barnards’ request, there is evidence *52 that these friends tended to upset her. Moreover, the physicians testified that the prohibition was enforced in the exercise of their best medical judgment. It is undisputed that the testatrix did receive many visitors at the sanitarium and all friends and relatives who called to see her at the Barnard residence were admitted.
Since childhood, the proponent had been particularly close to her sister. She visited the decedent almost daily during the five-year period preceding the hospitalization. Proponent and her husband concerned themselves with decedent’s personal affairs, particularly decedent’s relations with her tenants. It is obvious that such conduct would not endear them to the tenants or to the decedent. Miss Walther, annoyed by these actions, ordered them to “stay out of her affairs” and remarked to others that the ‘ ‘ Barnards were after her money ’ ’. During the initial stay at the sanitarium she commented that she was practically kidnapped, was not sick and was there only because “Lena [Mrs. Barnard] wanted her money”.
The draftsman of the decedent’s will was originally retained as attorney in connection with a case concerning the incompetent’s property. Thereafter he was appointed as a cosigner of the committee checks. Subsequently at a meeting with the sister as committee, he was informed by her that the decedent desired to make a will.
Obedient to the wishes of the decedent, the attorney arranged to interview, and did interview, the decedent alone at the Barnard residence. He testified that she was precise, rational and decisive in answering questions in regard to her relatives, her property and its disposition. Four days later the attorney returned and reviewed the proposed distribution with her in complete privacy. According to the attorney, the decedent at that time said: “I don’t wish to leave anything to my nieces and nephews in this country because they never paid much attention to me, and that was true even before I was sick and it certainly is true now.” When the lawyer informed her that a distributee could object to the probate of the will, decedent stated that she expected him 4 ‘ to put up every sort of a fight to prevent anybody from sharing in this estate except my sister and the Church ”.
Before the will could be executed, decedent suffered a slight stroke and was again placed in the sanitarium. FoEowing *53 assurances from her physicians as to her competency, the attorney delivered the will to her brother-in-law and instructed the physicians in the legal requirements necessary for the proper execution of a will.
When the attorney received the executed will, he noticed that the decedent had raised a bequest to her church from $200 to $500 by an ink interlineation. Because of the mental condition of the decedent the lawyer desired a ‘1 perfect ’ ’ original for probate. He, therefore, redrafted the will and promptly delivered the amended will to the physicians for execution.
The two psychiatrists attending the decedent were the subscribing witnesses to both wills executed on the same day. On both occasions, they testified, she requested that the will be read to her. After it was read to her she declared it to be her last will and testament and signed the document in their presence. She then requested them to witness her will and both witnesses swore that they signed in each other’s presence.
The draftsman did not witness the execution. He preferred, he said, to leave the question of decedent’s testamentary capacity to the professional opinion of the subscribing psychiatrists.
Her former attorney testified that she had stated to him on many occasions that she intended to execute a will. While she never mentioned a proposed distribution, it was his recollection that she indicated a desire to leave the greater part of her estate to charity. He also recalled that she mentioned her brothers and sister but not her nieces and nephews.
The concept of undue influence does not readily lend itself to precise definition or description. But this court, long ago, had established the criteria by which undue influence is to be determined: “It must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which conld not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist. It must not be the promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount *54 to force or fear * * * lawful influences which arise from the claims of kindred and family or other intimate personal relations are proper subjects for consideration in the disposition of estates, and if allowed to influence a testator in his last will, cannot be regarded as illegitimate or as furnishing cause for legal condemnation” (Children's Aid Soc. v. Loveridge, 70 N. Y. 387, 394-395; see, also, Smith v. Keller, 205 N. Y. 39, 44; Matter of Schillinger, 258 N. Y. 186, 191).
With these guideposts before us, we think that the objectant has not sustained the burden of proof, and that the evidence here was insufficient to support a finding of undue influence.
The record is devoid of any direct evidence that the proponent interfered with the making of the will. Mrs. Barnard did not draft the document; she did not dictate it; she was not present when its proposed contents were discussed; she was not present when the will was executed. The circumstances surrounding the drafting and execution of this document fall far short of a showing that undue influence was exercised. On the contrary, they indicate that the will was the product of the free and unfettered act of the testatrix (Smith v. Keller, 205 N. Y. 39, supra).
The subscribing witnesses, both psychiatrists, testified that they were the only ones present when decedent signed her will, and that she was rational and not under any restraint or undue influence (Holcomb v. Holcomb, 95 N. Y. 316, 320).
Of course, undue influence may also be proved by circumstantial evidence (Rollwagen v. Rollwagen, 63 N. Y. 504, 519), but this evidence too must be of a substantial nature. Evidence must be adduced from which inferences of undue influence can be reasonably drawn before a will should be denied probate (Matter of Powers, 176 App. Div. 455; Matter of Fleishmann, 176 App. Div. 785; Matter of Ruef, 180 App. Div. 203, affd. 223 N. Y. 582).
While the evidence in this case may be consistent with the hypothesis that the chief beneficiary induced the will by undue influence, the evidence is equally consistent with the assumption that the will expressed the decedent’s own voluntary intent. “ An inference of undue influence cannot be reasonably drawn from circumstances when they are not inconsistent with a contrary inference.” (Matter of Ruef, 180 App. Div. 203, 204, affd. 223 N. Y. 582, supra.)
*55 The fact that the draftsman was not the personal attorney of decedent, but rather a stranger solicited by the proponent, does not support a finding of undue influence in view of the procedures followed in drafting and executing the document. (Matter of Martin, 98 N. Y. 193; Matter of Voorhis, 125 N. Y. 765, affg. 54 Hun 637; Matter of Isham, 287 N. Y. 564.)
So, too, the mere fact that one is the sole legatee or sole distributee is not in itself evidence of the exercise of undue influence. (Matter of Dowdle, 224 App. Div. 450, affd. 256 N. Y. 629.)
AdditionaEy, the wiE here is not unnatural or the result of an unexplained departure from a previously expressed intention of the decedent. (Tyler v. Gardiner, 35 N. Y. 559; Eckert v. Page, 161 App. Div. 154, 156.) Decedent left her estate to her sister, who was, beyond doubt, her most intimate companion. The only other close relatives in the family group were brothers living in Germany. The nephews and nieces residing in this country were not attentive. Under these conditions we may readily conceive that decedent would leave the bulk of her worldly possessions to a relative who was soEcitous of her weE-being. Viewed in this manner, the wiE appears to be the result of consanguinity and the prompting of affection (Children’s Aid Soc. v. Loveridge, 70 N. Y. 387, supra).
A mere showing of opportunity and even of a motive to exercise undue influence does not justify a submission of that issue to the jury, unless there is in addition evidence that such influence was actually utilized. (Cudney v. Cudney, 68 N. Y. 148, 152; Matter of Reid, 298 N. Y. 878.) It seems to us that the proponent and her husband were very close to the decedent. Moved by a sense of kinship and family duty, they, confronted with a stubbornness common to independent elderly people, compeEed the decedent to submit to needed medical treatment and nursing care. Unquestionably she resented this intrusion into her private affairs, but this was only a natural reaction under the circumstances. The evidence does not irresistibly exclude the inference that family ties, natural demands of love and affection prompted the decedent to dispose of her property in this manner. Mrs. Barnard aided her sister both morally and physicaEy during her lengthy iEness and is now unfairly charged with undue influence by a relative who was *56 almost a stranger and who paid little or no attention to decedent while she lived.
The contestant’s position is not aided because of the relationship of sisters (Matter of Brand, 185 App. Div. 134, 139-140; see, also, Matter of Martin, 98 N. Y. 193; cf. Matter of Moskowits, 303 N. Y. 992) or that Mrs. Barnard was a fiduciary acting as committee for her sister. The sense of family duty is inexplicably intertwined in this relationship which, under the circumstances, counterbalances any contrary legal presumption (see Children’s Aid Soc. v. Loveridge, supra; Matter of Kindberg, 207 N. Y. 220, 228; Marx v. McGlynn, 88 N. Y. 357, 373; Matter of Hurlbut, 48 App. Div. 91, 93).
We conclude that the record as a whole and the circumstances surrounding the execution of this will, individually or collectively, were insufficient to present a question of fact for the jury. The evidence is in no way inconsistent with the assumption that the will expresses the voluntary intent of the testatrix and does not satisfy the test that intervention and undue influence can only be established by evidence that is not inconsistent with a contrary hypothesis (Matter of Williams, 141 N. Y. 572; Matter of Ruef, supra; Matter of Fleischmann, supra; Davids, New York Law of Wills, § 70, p. 118).
There is no evidence presented requiring the submission of the case to the jury and proponent’s motion for a directed verdict should have been granted. Therefore, the order of the Appellate Division and the decree of the Surrogate’s Court should be reversed, with costs to all parties appearing separately and filing briefs, payable out of the estate, and the matter remitted to the Surrogate’s Court with directions to admit the will to probate;
Judges Desmond, Dye, Fuld and Froessel concur with Judge Burke ; Chief Judge Conway and Judge Van Voorhis dissent and vote to affirm.
Order of Appellate Division and decree of the Surrogate’s Court reversed, with costs to all parties appearing separately and filing separate briefs payable out of the estate, and matter remitted to the Surrogate’s Court for further proceedings in accordance with the opinion herein.