# In the Matter of the Estate of BERTHA COLLINS, Deceased.

Fourth Department, January 23, 1987

## APPEARANCES OF COUNSEL

*Rice, Reid, Broderick & Wattengel (Paul H. Reid, Jr.,* of counsel), for appellants.

*Grossman, Levine & Civiletto (Samuel Civiletto* of counsel), for respondent.

## OPINION OF THE COURT

DOERR, J.

Bertha Collins died on June 4, 1981 at the age of 80 years. She was survived by two distributees, her nephews Richard and Robert Hoffman, the objectants in this action. At her death, the decedent left two wills. The first, dated January 31, 1951, left her entire estate to her husband, James Collins, who predeceased her. The second will, the subject of this proceeding, is dated January 17, 1977 and left $1,000 to each of her

nephews, $100 to her sister-in-law, Isabel "Billy" Hoffman and the residue to William Mayne, the draftsman of the will and Bertha Collins' accountant and financial advisor. The earlier will was offered for probate, but was objected to by William Mayne who then offered the 1977 will. In a prior proceeding challenging proper execution of this later will, the Court of Appeals, reversing this court's finding, held that the fact that the witnesses to the will could not recall the events of the will's execution did not necessarily bar the will from probate *(Matter of Collins,* 60 NY2d 466), and on remittitur we found due execution *(Matter of Collins,* 101 AD2d 694). We further held that objectants could still litigate their other objections to the validity of the will, the decedent's competency to make a will, and the issue of fraud and undue influence in procuring the will. Thereafter, a lengthy trial ensued.

The record establishes that Bertha Collins and her husband, James Collins, lived uneventful lives and enjoyed good relations with their families, which included the objectants. There were frequent visits between the Collinses and the Hoffmans. The Collinses had no children.

Toward the end of 1975, James Collins and Bertha Collins both began to suffer physical and mental deterioration. James had trouble with his personal hygiene and Bertha exhibited strange behavior, complaining that James had girlfriends in the garage. On another occasion police were called because Bertha was of the mind that there were monkeys in the house. A survey of the house revealed no monkeys.

In late March 1976, James Collins allegedly assaulted his wife. William Mayne reported this incident to the police and, indeed, Mayne signed the information leading to the arrest of James Collins. James was taken for observation to DeGraff Memorial Hospital where he died in April 1976. At her husband's funeral, Bertha mentioned that the flowers on the "piano" were beautiful, but she was pointing to her husband's casket.

After James' death, Bertha stayed with her sister-in-law, Billy Hoffman, in the latter's one-bedroom retirement apartment, and then spent six days with Richard Hoffman and his wife where, again, she exhibited unusual behavior such as dressing at 3:00 A.M. wanting to go outdoors, talking about a "cute little dog" when no dog was present, and thinking her husband was still alive. While Bertha was at the Hoffman's, Mayne advised them that he had made arrangements for

Bertha to be admitted to the Senior Meadows Retirement Center. After her admission to the Center, Bertha's bizarre behavior continued as indicated in the record.

During the hospitalization of James Collins, the need for the appointment of a conservator for Bertha was indicated. Bertha implied that she would like Mayne to be appointed her conservator and the question came down to whether he or the then attorney for the Collinses should be appointed. The Surrogate rejected both suggestions and, instead, appointed a stranger, one Francis Shedd, an attorney. Shedd thereafter requested Mayne to deliver all pertinent documents relating to Bertha's assets to him and interviewed Bertha, explaining his position as conservator and inquiring of her about her assets. The conservator also discussed with testatrix the possibility of a new will. Bertha indicated to the conservator that she would like to leave her estate primarily to her two nephews and that she was also fond of her sister-in-law, Billy Hoffman. Shedd asked Bertha whether she planned to leave anything to Mayne, to which she replied: "Why should I?" Mayne had earlier delivered to the conservator a bill for $4,500 for services rendered, otherwise unexplained, and upon showing the bill to Bertha she had no reaction. The record contains a memorandum authored by Shedd after his meeting with Bertha summarizing his conversation with her. In this memorandum the conservator concluded that Bertha's competence to make a new will was questionable, but since she had indicated to him that she wanted her nephews to be the primary beneficiaries of her estate, it was his judgment that instead of having a new will, it would be better to let her property pass by the laws of intestacy since her nephews would be the distributees in any event.

On January 19, 1977, the conservator, Shedd, sent a letter to Mayne asking him to turn over Bertha's will. In response, he received a note from Mayne with a copy of the 1951 will, which Shedd then filed in the Surrogate's office. However, as the reality of events unfolded, and they are not disputed, Mayne had drafted and assisted Bertha Collins in executing a new will dated January 17, 1977. No one knew of this will except Mayne, and possibly Bertha Collins, until after the latter's death in June 1981. It is this will which is the subject of these proceedings.

The circumstances surrounding the execution of this will require comment. Richard Kahl, the attorney who represented the James Collins estate and was Mayne's attorney, testified

that, in September 1976, Mayne contacted him suggesting that Bertha execute a new will. Kahl declined to prepare such a will because at that time he was representing the conservator who was opposed to a new will. Kahl did, however, recommend to Mayne that if a new will was contemplated, a doctor should first certify that Bertha was competent before she signed a new will. Ostensibly, in response to this advice, Mayne prepared a will for Bertha Collins in which he was the primary beneficiary, prepared an affidavit for a physician to sign attesting to her competency, and took Bertha to the office of Dr. Clark Thrifthauser, who was not decedent's regular physician. After interviewing Mrs. Collins, the doctor signed the affidavit prepared by Mayne attesting to decedent's soundness of mind and memory. On the same day, armed with this affidavit and the newly prepared will, Mayne escorted Bertha to a bank where she signed the document in the presence of the bank manager and assistant manager, who acted as witnesses to the will.

At the conclusion of the trial, the jury found that the testatrix was of sound mind and memory and competent to make a will, and that execution of the will was not procured by undue influence. The objectants have appealed, arguing that this verdict is against the weight of the credible evidence. We agree, and accordingly remit for a new trial.

We first observe that the issue of due execution of the will found by the jury and challenged on this appeal has already been decided *(Matter of Collins, 101 AD2d 694, supra)*. Appellants' attack on this portion of the verdict is without merit and should not be tried again.

Turning to the competence issue, "[i]t is the indisputable rule in a will contest that '[t]he proponent has the burden of proving that the testator possessed testamentary capacity and the court must look to the following factors: (1) whether she understood the nature and consequences of executing a will; (2) whether she knew the nature and extent of the property she was disposing of; and (3) whether she knew those who would be considered the natural objects of her bounty and her relations with them' " *(Matter of Kumstar, 66 NY2d 691, 692, quoting Matter of Slade, 106 AD2d 914, 915; see also, Matter of Delmar, 243 NY 7)*. On the day she signed her will, Bertha was examined by Dr. Thrifthauser, who was not her regular physician. Although he found her oriented to time and place, he asked her no questions that would establish whether she was then cognizant of the nature and extent of her property

or the natural objects of her bounty. Dr. Thrifthauser's testimony is, therefore, not conclusive of the issue and was rebutted by other evidence in the record. Francis Shedd, Bertha's conservator, discussed the possibility of making a new will with Bertha and found that she was confused about the extent and value of her property. He concluded that her competence to make a new will was questionable and that her property should be permitted to pass by intestate succession. Bertha's longtime physician, Dr. Howard Barnett, testified as to her deteriorating mental and physical condition, observing that he changed her medication in September of 1976. Dr. Barnett opined that decedent was not of sound mind and memory sufficient to make a will. In view of this testimony and the testimony of others describing Bertha's frequently delusional behavior, we find the jury verdict of competence to be against the weight of the credible evidence.

■ We also find the jury's verdict of no undue influence unsupported by the record. A person has a perfect right to do what he wants in the disposition of his property if he actually reached his own conclusion to make such disposition without being subject, not merely to influence, but to undue influence *(Matter of Anna,* 248 NY 421, 426). The burden of proof on the question of undue influence rests with the contestants.

"Undue influence is seldom practiced openly, but it is, rather, the product of persistent and subtle suggestion imposed upon a weaker mind and calculated, by the exploitation of a relationship of trust and confidence, to overwhelm the victim's will to the point where it becomes the willing tool to be manipulated for the benefit of another" *(Matter of Burke,* 82 AD2d 260, 269).

A long line of cases establish that there are two types of undue influence—" 'the gross, obvious and palpable type of undue influence which does not destroy the intent or will of the testator but prevents it from being exercised by force and threats of harm to the testator or those close to him. The other class is the insidious, subtle and impalpable kind which subverts the intent or will of the testator, internalizes within the mind of the testator the desire to do that which is not his intent but the intent and end of another' " *(Matter of Burke, supra,* p 270, quoting *Matter of Kaufmann,* 20 AD2d 464, 482-483, *affd* 15 NY2d 825; *see also, Matter of Walther,* 6 NY2d 49, 53-54).

While undue influence most often is not the subject of direct

proof, it may be proved by circumstantial evidence *(Matter of Walther, supra,* p 54). " 'It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person' " *(Matter of Anna,* 248 NY 421, 424, quoting from *Rollwagen v Rollwagen,* 63 NY 504, 519).

In the instant case, the only fair interpretation of the evidence is that William Mayne internalized within the mind of the testatrix the desire to do that which was not her intent but was the intent and end of himself. The most striking proof of undue influence is the secrecy surrounding the drafting and execution of the will. Mayne admitted that he drafted the will; prepared the affidavit for Dr. Thrifthauser to sign; made the appointment for Bertha to see Dr. Thrifthauser; and transported her to a bank where strangers witnessed her will. Moreover, he went so far as to keep the will secret from Bertha's conservator, even though the conservator asked Mayne to send him a copy of her will. Mayne actually sent the conservator a copy of the 1951 will, knowing that *at the time he sent the will* it was already revoked by the new will he had drafted. Mayne's own actions in keeping the will a secret prevented persons concerned for Bertha's welfare, such as the conservator, from ascertaining whether the provisions of the will did, in fact, comport with her true intent.

Although the burden of establishing that there has been undue influence in a particular case rests upon the objectant and does not shift, where there is a confidential relationship between the decedent and the beneficiary/drafter of the will, the mere fact of the bequest, standing alone, permits an inference of undue influence, and the drafter then has the burden of offering an explanation, alternative to his influence, for the contested will *(Matter of Putnam,* 257 NY 140; *Matter of Lawson,* 75 AD2d 20, 27; *Matter of Kaufmann, supra,* p 482).

William Mayne did come forward with his version of why Bertha Collins would leave virtually her entire, fairly substantial estate to him: he had been a loyal and devoted friend for 20 years while her relatives were indifferent toward her; he had been looking after her financial affairs (although for the last five years of her life decedent had a conservator); he signed the assault complaint against decedent's husband; he

aided in her placement at Senior Meadows Retirement Center; and decedent suggested that he be her conservator. Although these facts are sufficient to meet the burden of going forward with proof as to why Bertha Collins would leave money to him, they are not sufficient to overcome the other evidence of undue influence present in this case. That evidence shows that Mayne had a motive to influence (an estate worth in excess of $100,000); he had the opportunity to influence (because of decedent's fragile mental state and her reliance on Mayne); and he actually used the opportunity to influence the decedent by having her execute a will in his favor (*Matter of Burke, supra,* pp 262-269). Not to be overlooked or treated lightly on this last point is the proponent's very act of preparing the will, a competency affidavit, and bringing about the will's execution. Mayne and Bertha Collins were no strangers to the participation of the court and lawyers in the Collinses' affairs. Richard Kahl was Mayne's personal attorney, the attorney for the James Collins estate and the attorney for the conservator. The conservator, whose responsibilities to Bertha Collins were fixed by the court, is an attorney. With legal assistance so readily available and the financial means to pay for this assistance, if need be, similarly available, it defies rational explanation why the proponent chose to bypass the logical people who could advise and aid Bertha if she really had a desire to make a new will.

Most compelling of all, in our view, is the deliberate and calculated deception, wholly unexplained by the proponent, in withholding and secreting from the conservator Bertha Collins' last will and testament when this was requested some five years before her death. For all of these reasons, the verdict of the jury finding no undue influence was against the weight of the credible evidence.

Accordingly, the decree should be reversed and a new trial granted (CPLR 4404; *Nicastro v Park,* 113 AD2d 129). We observe that, upon the new trial, Bertha's conservator, Francis Shedd, must withdraw from representing the objectants. He is a key witness in these proceedings and his representation of one of the parties violates the Code of Professional Responsibility, and his financial interest in the outcome may have prejudiced the jury (*see,* DR 5-101 [B]; DR 5-102 [A]; *People v*

*Paperno,* 54 NY2d 294, 300; *Matter of Van Zandt,* 117 AD2d 812; *Presser v Spiegel & Sons Oil Corp.,* 106 AD2d 560).

DILLON, P. J., DENMAN, PINE and LAWTON, JJ., concur.

Decree unanimously reversed, on the facts, with costs, and new trial granted.