ESTATE OF VIRGINIA W. CROSSMORE, DECEASED, EDWARD Y. CROSSMORE, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Crossmore v. Commissioner
Docket No. 25910-87.
United States Tax Court
T.C. Memo 1988-494; 1988 Tax Ct. Memo LEXIS 516; 56 T.C.M. (CCH) 483; T.C.M. (RIA) 88494; October 12, 1988. *516 When decedent died she owned an interest in the estate of another arising under a will not probated at the valuation date. Held, the date-of-death fair market value of decedent's interest was $ 270,179 after discount for the nuisance value of the anticipated claim of undue influence against the will giving rise to that interest. Sec. 2031(a). Frank Smithson, for the *517 petitioner. Gary D. Borek, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: By statutory notice dated May 4, 1987, respondent determined a deficiency of $ 89,662.31 in the Federal estate tax of the Estate of Virginia W. Crossmore. After concessions, the sole issue for decision is the value for Federal estate tax purposes of Mrs. Crossmore's interest in the estate of her deceased aunt, Ethel S. Wilkinson. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations and exhibits attached thereto are incorporated herein by reference. On March 21, 1983, Virginia W. Crossmore (decedent) died from cancer. At the time of her death, decedent's domicile was Ithaca, New York. Decedent died testate and her children, Edward Y. Crossmore (Crossmore or decedent's son) and Betsy L. Donovan (decedent's daughter), were appointed co-executors of her estate. An estate tax return was timely filed by Crossmore, as executor of decedent's estate, with the Internal Revenue Service at Andover, Massachusetts. Ethel Wilkinson was a spinster who never finished high school and never worked for a *518 living. After her parents' death she appears to have been supported by her sister, Lucy Bolton. In addition to providing her sister with a place to live and spending money, Mrs. Bolton also oversaw all of Miss Wilkinson's financial affairs. Mrs. Bolton further provided for Miss Wilkinson in her will. The terms of Mrs. Bolton's will, however, caused a rift in the family which prompted a series of litigated disputes. After Mrs. Bolton died, decedent began looking after Miss Wilkinson's financial affairs. Decedent received her aunt's bills directly and paid them with checks drawn on an account established for her aunt after Mrs. Bolton's death. Decedent saw that Miss Wilkinson had adequate spending money. Decedent also served as Miss Wilkinson's connection to the outside world. They maintained close telephone contact and when Miss Wilkinson ventured outside of her home it was normally in the company of decedent. This was particularly true after Miss Wilkinson fell and broke her hip in 1975. As Miss Wilkinson advanced into her eighties, she became increasingly dependent on decedent. Decedent responded by taking a more active role in caring for her elderly aunt. The family *519 dispute centering around the construction of Mrs. Bolton's will solidified the relationship between Miss Wilkinson and decedent. The dispute had just the opposite effect on Mrs. Wilkinson's relationship with the other members of her large family. In the years prior to her death, Miss Wilkinson's contact with family was limited almost exclusively to that which she enjoyed with decedent and decedent's two children. Infrequently, decedent's brother, Robert Wilkinson, would visit his aunt. He maintained a relatively neutral position in the family dispute because of his involvement as a co-executor of Mrs. Bolton's estate. Miss Wilkinson executed a will in 1961 which would have resulted in the distribution of most of her estate to several of her siblings. Mrs. Bolton was included in the dispositive scheme of the 1961 will as the primary beneficiary. Miss Wilkinson subsequently revoked that will and on December 29, 1972, she executed a second will calling for the equal distribution of her estate between decedent, decedent's son, decedent's daughter, and decedent's brother, Robert Wilkinson. [1] By the time the 1972 will was executed, the siblings who would have benefited most under Miss *520 Wilkinson's prior will had all died. The 1972 will was drafted by Harold Simpson. Mr. Simpson had formerly acted as Mrs. Bolton's personal attorney. On January 10, 1974, Miss Wilkinson executed a third will which reflected a dispositive scheme similar to that of the 1972 will with the same four beneficiaries sharing her estate but in different proportions. Miss Wilkinson's house was devised to decedent and decedent's son as joint tenants with rights of survivorship. The remainder of the estate was divided three eighths each to decedent and decedent's son and one-eighth each to decedent's daughter and decedent's brother. Another will executed in 1975 continued the same general distribution pattern. Miss Wilkinson's final will was dated January 24, 1978. Decedent was the sole beneficiary. By codicil, executed in 1981, Miss Wilkinson provided that, if decedent predeceased her, her estate was to be equally divided between decedent's two children. In 1973, Crossmore, an attorney, *521 became concerned about the possibility of a will contest based on both undue influence and lack of testamentary capacity when decedent asked him to draft a new for Miss Wilkinson. He declined because both he and decedent were to be named as beneficiaries. On his advice, decedent sought out another attorney, James Gabriel (Gabriel), to draft Miss Wilkinson's will. Gabriel drafted and supervised the execution of Miss Wilkinson's last three wills. In an attempt to minimize the risk of a successful challenge based on lack of testamentary capacity, he arranged for the two physicians familiar with Miss Wilkinson's physical and mental condition to act as witnesses. Even more attention was paid to the possibility of an undue influence claim. Gabriel believed that the relationship between decedent and her aunt and the litigation in the family over Mrs. Bolton's estate were indicative of a potential problem. Accordingly, Gabriel was careful to interview Miss Wilkinson out of the presence of decedent. He conducted the interviews in a manner which he felt was conducive to soliciting Miss Wilkinson's true testamentary intent and he believed that his efforts were successful. After Miss *522 Wilkinson's death on January 6, 1983, arrangements were made to retain James J. Clynes, Jr. (Clynes) as trial counsel for the probate of the will because Crossmore and Gabriel believed that they were likely to be witnesses in the will contest which both anticipated. Clynes is a long-time member of the New York bar with experience in probate proceedings, including will contests, dating back of 1955. He represented the three co-executors of Mrs. Bolton's estate in the prior litigation. Shortly prior to her aunt's death, decedent was diagnosed as having terminal cancer with only a short time to live. The outlook prompted Crossmore, Gabriel, and Clynes to contemplate perpetuating decedent's testimony for use in the expected contest of her aunt's will, but they were unable to implement this idea on account of decedent's rapidly declining health. Decedent died on March 21, 1983, before the filing of a petition for the probate of Miss Wilkinson's will. The unavailability of decedent to testify intensified concern about the possibility of a claim of undue influence. Petitioner believed that decedent's death increased the probability of a successful contest of Miss Wilkinson's will. When *523 Miss Wilkinson died she was survived by forty-three distributees, decedent included, all of whom were descendants of her siblings. [2] Because Miss Wilkinson named decedent as sole beneficiary to the exclusion of all of the other distributees each of them was considered to be a prospective contestant. A petition for the probate of Miss Wilkinson's will was filed on October 11, 1983. Two of the potential distributees filed objections to the probate. The objections raised claims of lack of testamentary capacity and undue influence. Shortly thereafter the contestants settled their contest for $ 5,000 and both objections were withdrawn. This settlement was very favorable to the estate. The estate's attorney, Clynes, charged the estate $ 1,000 for the services rendered in resolving the objections. Miss Wilkinson's will was admitted to probate in February 1984. Pursuant to *524 that will, decedent's estate received Miss Wilkinson's entire estate less expenses, including the $ 6,000 cost associated with the will contest. On decedent's Federal estate tax return, petitioner valued decedent's interest in the estate of Miss Wilkinson at $ 50,000. In the notice of deficiency, respondent determined that the value of the interest was $ 279,679.56. [3]
OPINION Respondent's determination of a deficiency is presumptively correct. Welch v. Helvering,290 U.S. 111 (1933). To rebut that presumption, petitioner must introduce some substantial evidence tending to show that the determination is erroneous. Rule 142(a). [4]
Property is included in *525 the gross estate of a decedent at its fair market value on the valuation date. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is inherently a question of fact to be resolved by weighing all the relevant evidence in the record and drawing appropriate inferences thereform. Estate of Gilford v. Commissioner,88 T.C. 38, 50 (1987); Estate of Andrews v. Commissioner,79 T.C. 938, 940 (1982). The standard for measuring "fair market value" is the price at which the property would change hands between a hypothetical willing buyer and seller, neither being under any compulsion to buy or seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. United States v. Cartwright,411 U.S. 546, 551 (1973); Estate of Andrews v. Commissioner, supra at 940; sec. 20.2031-1(b), Estate Tax Regs. In this case, the property in question is decedent's interest in the estate of Miss Wilkinson. Decedent died before her aunt's will could be probated. The petitioner made no election under section 2032 so that the date of death is the appropriate valuation *526 date, which required valuing decedent's interest in Miss Wilkinson's estate without the benefit of hindsight as to the settlement of the will contest. Thus, as of the valuation date, petitioner did not know whether the Wilkinson will would be admitted to probate. Petitioner contends that a substantial discount is appropriate because there existed at the valuation date the possibility of a successful will contest based upon a claim of undue influence. Respondent contends that a discount, if any, is appropriate only for the nuisance value of the undue influence claim anticipated by petitioner. [5]
Under United States v. Cartwright, supra, *527 the willing buyer is assumed to have reasonable knowledge of material facts. Thus, in our view, any purchaser of decedent's interest in her aunt's estate would anticipate the possibility of a claim of undue influence (and possibly lack of testamentary capacity) [6] and would therefore discount the amount to be paid for that interest by the costs and hazards of litigating such a claim. Unfortunately, neither party succeeded in properly evaluating those costs and hazards. This leaves us with the task of re-evaluating the costs and hazards of litigation with an eye toward deciding an appropriate discount. Before addressing the shortcomings of the parties' evaluations and engaging in our own re-evaluation, we find it necessary to comment upon a preliminary evidentiary matter raised by respondent. [6]
Petitioner proffered James J. Clynes, Jr., as an expert witness to testify in substantial part to the meaning and applicability of probate law, particularly with respect to undue influence, giving his expert opinion on the governing law as well as its *528 applicability under the facts of this case. Respondent objected to Clynes' report as being an expression of an opinion of the existing law in New York. As a general proposition an expert witness is not free to state his opinion on matters of domestic law. See Marx & Co. v. Diners' Club, Inc.,550 F. 2d 505 (2d Cir. 1977), cert. denied 434 U.S. 861 (1977). The significant difference here is that the expert witness evidence was presented to a judge, not to a jury. Consequently the risks attendant in Marx & Co. were not present in the instant case. There is no danger of a jury thinking "that the 'expert' in the particular branch of the law knows more than the judge * * *." Marx & Co. Diner's Club, Inc., supra, at 512. Furthermore, a Federal judge taking judicial notice of state law may inform himself of that law in the manner of his choosing. United States v. Romano,482 F.2d 1183, 1191 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974). *529 The trial court has within its sound discretion the admission or exclusion of expert testimony. Salem v. United States Lines Co.,370 U.S. 31, 35 (1962). In considering the admissibility of expert testimony it is important to keep in mind the matter at issue. The question in this case is whether petitioner properly discounted the value of decedent's interest in her aunt's estate, not whether her aunt's will should be invalidated because of undue influence. The probability of successfully probating the will giving rise to decedent's interest figures prominently into the process of valuing that interest. Nevertheless, it is only the factual question of valuation with which we are here concerned and it is well established that opinions on value are within the province of a knowledgeable expert. See, e.g., Spitzer v. Stichman,278 F.2d 402, 409 (2d Cir. 1960). Expert opinion evidence must, however, be weighed in light of the expert's demonstrated qualifications and all other evidence of value. Estate of Christ v. Commissioner,480 F.2d 578, 584 (6th Cir. 1974); Kreis' Estate v. Commissioner,227 F. 2d 753, 755 (6th Cir. 1955), *530 affg. a Memorandum Opinion of this Court. We are free to either embrace or reject testimony, whichever in our judgment is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938). Petitioner relied primarily on the expert opinion of Clynes in arriving at the discounted value of decedent's interest in her aunt's estate. Clynes testified that he had participated in approximately 15 will contests which were pursued to the eve of or through trial. He acknowledged that claims of undue influence are not generally successful and that the same is true of claims with which he has been personally involved. Additionally, Clynes dealt with many of the same people here involved in his capacity as counsel for the executors of Mrs. Bolton's estate. His exposure to the prospective contestants in matters of the prior estate left him with the opinion that they were "litigation minded" and that they harbored some animosity towards decedent and decedent's son. Clynes' report and testimony also disclose his belief that decedent's death enhanced the prospects for a successful will contest by making her unavailable to refute a claim of undue influence. Based on his experience, *531 both with the family and with probate matters generally, Clynes placed the probability of successfully probating Miss Wilkinson's will at less than 50 percent. Clynes estimated that the estate would incur $ 7,500 of legal fees for the probate of Miss Wilkinson's will, including a trial on the anticipated objections. He concluded that a "very substantial discount" in value would be appropriate. Clynes' assessment of the hazards of litigating the anticipated claim of undue influence is unrealistic. Clynes' failure to accurately assess the situation is best reflected by his inability to square his acknowledgement that most undue influence claims are not successful with his estimation that there was a 50- to 80-percent chance that the claim anticipated here would have been successful. We are not satisfied that he had the basis necessary to support that prediction. Specifically, we do not agree that a relationship such as the one shared by decedent and her aunt gives rise to either a presumption or an inference of undue influence nor do we agree that there was no one other than decedent to refute a claim of undue influence. The only explanation offered by Clynes for his opinion on *532 the discount was that the individuals involved posed a special problem. His apparent concern with the intrafamily animosity speaks only to the possibility that such a claim would be pursued and not to its merits. The settlement of the will contest for $ 6,000 shocked Clynes. He believed that it was favorable to the will proponent and we agree. However, we do not agree with his opinion of what would have constituted a reasonable settlement of the will contest. He estimated that settlement could have cost as much as 40 percent of the value of Miss Wilkinson's estate. We doubt the accuracy of this estimate for the same reason we doubted his opinion regarding the improbability of successfully probating Miss Wilkinson's will. He overrated the merits of the prospective contestants' case. Accordingly, Clynes' estimate of a fair settlement is too high and any discount derived from such estimate is also too high. However, his estimate would mark the upper limit of the range within which an appropriate discount must fall. Having rejected the expert's opinion, we of course reject petitioner's discount for the costs and hazards of litigation. That discount is more than double the discount *533 which its own expert thought to be appropriate. [7]
Respondent now argues that a $ 6,000 discount was appropriate for the costs and hazards of litigation, relying on events occurring after the decedent's date of death, specifically the actual settlement of the anticipated claims. "Tempting as it is to correct uncertain probabilities by the now certain fact * * *," Ithaca Trust Co. v. United States,279 U.S. 151, 155 (1929), we cannot permit the determination of value to be based upon the wisdom of hindsight. The issue is *534 the value of the interest as of the decedent's date of death, not some future date, and it is well established that events occurring after the decedent's death are not controlling. American Nat. Bank & Trust Co. v. United States,594 F.2d 1141, 1144 (7th Cir. 1979); Estate of Curry v. Commissioner,74 T.C. 540, 548 (1980). Respondent's determination is too conservative in light of the fact that a claim of undue influence seemed inevitable at the valuation date. Moreover, petitioner cannot be charged with knowing that the forthcoming claim would be resolved in a manner so favorable to the preservation of decedent's interest. The $ 6,000 cost of the ensuing settlement merely markes the lower limit of the range within which an appropriate discount must fall. Although a determination of value frequently involves "a conjecture, a guess, a prediction, a prophecy," Commissioner v. Marshall,125 F.2d 943, 946 (2d Cir. 1942), revg. on other grounds 43 B.T.A. 99 (1940), we refrain from picking values at random simply because we disagree with the valuations of both petitioner *535 and respondent. Estate of Gilford v. Commissioner,88 T.C. 38, 50 (1987). We endeavor to reach a conclusion on valuation which is capable of logical explanation. Estate of Gilford v. Commissioner, supra.But, as observed in the past, the inherent inexactitude of the valuation process sometimes requires us to make "Solomon-like" pronouncements. See Messing v. Commissioner,48 T.C. 502, 512 (1967); see also Symington v. Commissioner,87 T.C. 892, 904 (1986); Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980). That consequence cannot be avoided here where we are working within the parameters set by the opinion of petitioner's expert which we rejected and the actual results of the will contest settlement relied upon by respondent. The best we can do is set forth the underpinnings of our ultimate decision providing, in the event of an appeal, a "trail for the appellate court to follow." Symington v. Commissioner, supra at 904 quoting Akers v. Commissioner,798 F.2d 894, 897 (6th Cir. 1986). This we now proceed to do. Our job of deciding what *536 constitutes an appropriate discount is complicated by the fact that undue influence is a subtle and variable concept not lending itself to precise definition under New York law. In re Walther's Will,6 N.Y.2d 49, 159 N.E.2d 665, 188 N.Y.S.2d 168, 172 (1959); In re Anderson's Will,3 Misc. 2d 869, 149 N.Y.S.2d 109, 111 (Sur. Ct. 1956). Nevertheless, any decision regarding the value of decedent's interest arising under a will not probated by the date of her death necessarily involves an in-depth examination of the hazards of litigating an anticipated claim of undue influence. In In re Walther's Will, the court recognized the following as the established criteria for determining undue influence: It must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist. It must not be the promptings of affection; the desire of gratifying the wishes of *537 another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear * * * lawful influences which arise from the claims of kindred and family or other intimate personal relations are proper subjects for consideration in the testator in his last will, cannot be regarded as illegimate or as furnishing cause for legal condemnation * * *.
In re Walther's Will, supra at 172, quoting Children's Aid Soc. of City of New York v. Loveridge,70 N.Y. 387, 394-395 (1877). The court in In re Will of Klitgaard,83 A.D.2d 651, 442 N.Y.S.2d 590, 591 (1981), stated the standard for determining undue influence as follows: "A will should not be invalidated for undue influence unless the acts of the influencing party are shown to effectively make it his will and not the will of the decedent." The circumstances surrounding the drafting and execution of the 1978 will and each of Miss Wilkinson's prior *538 wills leave the record devoid of direct evidence indicating that the will giving rise to decedent's interest was anything other than the free and unfettered act of her aunt. Decedent did not draft the document; she was not present when its proposed contents were discussed; and although she was present when the document was executed, she neither participated in nor interfered with the execution in any way. Cf. In re Walther's Will, supra at 172. Undue influence may, however, be proven by circumstantial evidence. [Undue influence] can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person. [Citations omitted.]
Rollwagen v. Rollwagen,63 N.Y. 519 (1875); see also In re Anna's Estate,248 N.Y. 421, 162 N.E. 473, 474 (1928); In re Bach,133 A.D.2d 455, 519 N.Y.S.2d 670, 671 (1987). *539 Miss Wilkinson and decedent shared a close relationship but this alone shows only that decedent had an opportunity to exercise undue influence over her aunt. Absent a showing that such influence was actually exercised the issue probably would not even be submitted to a jury. In re Will of Colbeck,45 A.D.2d 796, 357 N.Y.S.2d 164, 165 (1974). Petitioner places too much reliance on the mere existence of such a relationship. In its brief, petitioner suggests that a relationship like the one shared by decedent and her aunt raises either a presumption or an inference of undue influence. New York law recognizes no such presumption. The burden is on the contestant to establish undue influence, In re Will of Klitgaard, supra at 591, and that burden does not shift. In re Estate of Collins,124 A.D.2d 48, 510 N.Y.S.2d 940, 944 (1987). The court permitted an inference of undue influence in Estate of Collins but it was not based solely on the existence of a confidential relationship between the proponent and the testatrix. The court also considered the *540 fact that the proponent, who was unrelated to the testatrix, drafted the will naming himself primary beneficiary and then secreted the will away until after the testatrix died. In re Estate of Collins, supra at 944-945. The cast before us lacks the "deliberate and calculated deception" which the court found so compelling in Estate of Collins and, accordingly, we find it unlikely that an inference of undue influence would be permitted under the less compelling circumstances presented here. Petitioner argues, in the alternative, that the existence of a confidential relationship gives rise to a duty of explanation on the part of decedent. In some situations where a beneficiary shares a confidential relationship with the testator, an explanation, other than undue influence, is required for the disposition made under the contested will. Petitioner, in his brief, cites several cases with facts requiring such an explanation. The facts of In re Carter's Will,199 A.D. 405, 191 N.Y.S. 551 (1921), reveal that the proponent was in a close confidential relationship with *541 an elderly testatrix to whom he was unrelated and that he had complete control over her property. Further, the will was prepared by the proponent's attorney, witnessed by the attorney and the proponent's brother-in-law, and paid for by the proponent. In In re Kaufmann's Will,20 A.D.2d 464, 247 N.Y.S.2d (1964), affd. 15 N.Y. 825, 257 N.Y.S.2d 941, 205 N.E. 2d 864 (1965), the court required an explanation from a proponent who shared a confidential relationship with the testator. An explanation was required because there was a marked departure from a prior, natural plan of testamentary disposition which excessively and unnaturally favors a nonrelative under circumstances establishing motive, opportunity, overreaching and persistent involvement in transfers and dispositions of property in contemplation of death.
In re Kaufmann's Will, supra at 685. The facts of the case before us are not nearly as suggestive of undue influence as the cases cited by petitioner, therefore, the duty to explain the disposition made under Miss Wilkinson's will is less likely to arise. Furthermore, there is nothing in the record indicating that such *542 a duty could not be satisfactorily discharged even if it did arise. Petitioner asserts that decedent's death greatly enhances the likelihood of a successful claim of undue influence because it contends that she was the only witness capable of refuting such a claim. Respondent takes a much different view of the situation arguing that decedent's death is a nullity as it pertains to the prospect of probating her aunt's will. Respondent contends that even if decedent had survived she would not have been competent to testify under the New York Dead Man's Statute. [8]N.Y. Civ. Prac. R. 4519 (McKinney 1963) (CPLR 4519). CPLR 4519 renders an interested witness incompetent to testify in certain situations regarding personal transactions with a decedent. The purpose of the statute is to prevent a person who is or might be assumed to be a partisan witness from giving his version of a transaction with another who has been silenced by death. In re Estateof Wood,52 N.Y.2d 139, 418 N.E. 2d 365, 436 N.Y.S.2d 850, 851-852 (1981).
*543 Petitioner argues that decedent's testimony would have been saved by the exception to the general rule of CPLR 4519. But petitioner's argument must fail because it is based solely on speculation as to which witnesses will testify, the substance of their testimony, the rulings expected from a trial court at a trial which might never occur, and misconceptions about CPLR 4519. Moreover, given the estrangement of Miss Wilkinson so amply expounded upon in the record, it is unlikely that the prospective contestants had sufficient knowledge of her personal affairs to make the potential operation of the exception consequential. Regardless of whether decedent's testimony could have been salvaged, we are not convinced that it was necessary for defending her interest against a claim of undue influence. There is no shortage of witnesses. Of all the witnesses who would normally testify in a probate proceeding, decedent is the only person not now available to do so and much of her testimony would likely have been precluded by CPLR 4519. After reviewing the record as a whole and carefully considering all arguments raised by petitioner and respondent, [9] we find that at the valuation date *544 there was a very strong likelihood that a claim of undue influence would be forthcoming but that the probability of success was so slight as to warrant a discount only for its nuisance value. Although no method exists for precisely evaluating nuisance value our decision is intended to reflect the evidence in the record and our own experience with matters of this nature. Cf. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930).
At the date of decedent's death we are convinced that a purchaser of her interest possessed of a reasonable knowledge of the relevant facts would have insisted upon a discount in an amount exceeding the cost actually incurred in settling the anticipated claim. However, the amount of that discount would be much closer to the actual settlement cost than to any figure which can be derived from the evidence put forth by petitioner. In our view, the appropriate discount would be $ 15,500. Accordingly, we hold that *545 the correct valuation of decedent's interest in her aunt's estate on March 21, 1983, after discount for the nuisance value of the anticipated claim of undue influence, is $ 270,179. We cannot determine how the $ 6,000 expense associated with the actual settlement was treated for estate tax or income tax purposes, either one or both, because the record fails to disclose the necessary facts. We do not intend, however, that petitioner receive the benefit of both a discount in the value of decedent's interest in Miss Wilkinson's estate and a deduction from the gross estate for that amount. Our valuation decision depends upon Miss Wilkinson's estate having a gross value of $ 285,679 prior to any discount or deduction for the $ 6,000 expense actually incurred in settling the will contest. We require that the parties bear this in mind when making the Rule 155 computation in accordance with this opinion. [10]
*546 To reflect the foregoing, Decison will be entered under Rule 155.
Footnotes
1. In her 1972 will, Miss Wilkinson made a preresiduary bequest of her jewelry to decedent and decedent's daughter. The residuary clause called for the division of her estate into four equal shares. ↩
2. As defined by N.Y. Surr. Ct. Proc. Act section 103 (McKinney 1967), "distributee" means: "Any person entitled to take or share in the property of a decedent under the statutes governing descent and distribution." ↩
3. The record does not disclose the basis for respondent's valuation. However, see n. 5, infra.↩
4. All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code of 1954 as amended and in effect as of the date of the decedent's death. ↩
5. The facts are not in the record but on brief respondent describes the value of decedent's interest in the following manner: "The value was equal to the potential total estate of ($ 285,679.56) less the cost of a nuisance settlement ($ 5,000) and legal fees ($ 1,000). The result ($ 279,679.56) equals the amount received by the estate." Petitioner never took issue with respondent's valuation determination; rather it is only the amount of the discount which is being disputed here. ↩
6. Petitioner does not argue for a discount based upon lack of testamentary capacity. ↩
7. In his report, Clynes deemed that a substantial discount would be appropriate without disclosing an exact amount. Presumably, the amount of the discount would have been equivalent to the amount which he considered to be a fair settlement of the will contest. He estimated that a fair settlement could cost as much as 40 percent of the value of Miss Wilkinson's estate. Thus, in Clynes' opinion, a discount of $ 114,271 ($ 285,679 X 40%) would have been appropriate. By valuing decedent's interest at $ 50,000, petitioner effectively took an 82-percent discount ($ 285,679 - $ 50,000 = $ 235,679 / $ 285,679 = .82). ↩
8. The Dead Man's Statute as embodied in CPLR 4519 provides in pertinent part: Upon the trial of an action or the hearing upon the merits of a special proceeding, a party or a person interested in the event * * * shall not be examined as a witness in his own behalf or interest * * * against the executor, administrator or survivor of a deceased person * * * except where the executor, administrator, survivor * * * is examined in his own behalf, or the testimony of the * * * deceased person is given in evidence, concerning the same transaction or communication. ↩
9. Because of our decision in this case we do not find it necessary to reach the merits of respondent's arguments regarding the effect, if any, of Miss Wilkinson's prior wills on the prospect of probating her most recent will. ↩
10. In the stipulations, the parties agreed that the $ 3,000 accrued bond interest on bonds received from Miss Wilkinson's estate would be includable in decedent's gross estate in the same proportion as decedent's interest in that estate. Accordingly, petitioner must include 95 percent ($ 270,179 / $ 285,679 = .9457) of the accrued bond interest in decedent's gross estate. ↩