Matter of Mary (2022 NY Slip Op 01220)





Matter of Mary


2022 NY Slip Op 01220


Decided on February 24, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:February 24, 2022

532934
[*1]In the Matter of the Estate of Virginia A. Mary, Deceased. Tina M. Kilkeary, as Executor of the Estate of Virginia A. Mary, Deceased, Respondent; Raymond L. Mary Jr., Appellant.

Calendar Date:January 6, 2022

Before:Garry, P.J., Clark, Aarons and Colangelo, JJ.

Niles & Bracy, PLLC, Plattsburgh (Evan F. Bracy of counsel), for appellant.
Law Offices of Stephen A. Johnston, Plattsburgh (Stephen A. Johnston of counsel), for respondent.



Garry, P.J.
Appeal from an order of the Surrogate's Court of Clinton County (Wait, S.), entered August 6, 2020, which, among other things, denied respondent's application for a decree admitting to probate an instrument purporting to be the last will and testament of decedent.
In March 2008, Virginia A. Mary (hereinafter decedent) purportedly executed a will in which she bequeathed all her property and assets, in equal shares, to her three children: petitioner, respondent and their sister (hereinafter the third sibling). In March 2018, decedent executed a new will, leaving her financial accounts to her three children in equal shares but leaving her home and its contents to respondent and his wife. Following decedent's death, petitioner sought to admit a copy of the 2008 will to probate, asserting that the original could not be located. Respondent objected and sought a decree admitting the 2018 will to probate. Following a bench trial, Surrogate's Court determined that decedent possessed testamentary capacity to execute the 2018 will but denied respondent's objections and his request to admit that will to probate, concluding that the 2018 will was the result of undue influence. The court also declined to admit a copy of the 2008 will to probate. Respondent appeals.
In reviewing a determination rendered after a nonjury trial, "this Court independently assesses the weight of the evidence and grants judgment warranted by the record, giving due deference to the trial court's determinations of witness credibility unless such findings are contrary to a fair interpretation of the evidence" (Mazza v Fleet Bank, 16 AD3d 761, 762 [2005]; see Matter of Jewett, 145 AD3d 1114, 1116 [2016]). A party claiming undue influence bears the burden of showing "'that the influencing party's actions are so pervasive that the will is actually that of the influencer, not that of the decedent'" (Matter of Prevratil, 121 AD3d 137, 142 [2014], quoting Matter of Malone, 46 AD3d 975, 977 [2007]). "Undue influence is seldom practiced openly, but it is, rather, the product of persistent and subtle suggestion imposed upon a weaker mind and calculated, by the exploitation of a relationship of trust and confidence, to overwhelm the victim's will to the point where it becomes the willing tool to be manipulated for the benefit of another" (Matter of Burke, 82 AD2d 260, 269 [1981]; accord Matter of Collins, 124 AD2d 48, 53 [1987]). For influence in creating a will to be considered undue, "[i]t must not be the promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear" (Matter of Walther, 6 NY2d 49, 53-54 [1959] [internal quotation marks and citations omitted[*2]]). "Although undue influence may be proven through circumstantial evidence, such evidence must be 'of a substantial nature'" (Matter of Prevratil, 121 AD3d at 142, quoting Matter of Walther, 6 NY2d at 54). Where the circumstantial evidence would support conflicting inferences that the will was executed based on either undue influence or the decedent's own volition, a conclusion of undue influence cannot reasonably be drawn (see Matter of Walther, 6 NY2d at 54; Matter of Malone, 46 AD3d at 978).
"Where there is a confidential relationship between parties to a transaction, . . . the burden shifts to the stronger party in such a relationship to prove by clear and convincing evidence that a transaction from which he or she benefitted was not occasioned by undue influence" (Matter of Bonczyk v Williams, 119 AD3d 1124, 1125 [2014] [internal quotation marks, brackets and citations omitted]; accord Matter of Giaquinto, 164 AD3d 1527, 1530 [2018], affd 32 NY3d 1180 [2019]; see Matter of Connelly, 193 AD2d 602, 603 [1993], lv denied 82 NY2d 656 [1993]). "Although close family ties may negate the presumption of undue influence that would otherwise arise from a confidential or fiduciary relationship," a factfinder could still decide that the stronger party "acted not out of family duty," but rather out of greed (Matter of Antoinette, 238 AD2d 762, 764 [1997]; see Matter of Giaquinto, 164 AD3d at 1532).
The third sibling lived in Maine but visited decedent several times each year. Petitioner cleaned decedent's house every weekend and arranged and transported decedent to all her medical appointments. Petitioner handled decedent's finances for 40 years, including balancing decedent's bank accounts and writing checks to pay bills. Respondent lived next door to decedent and would spend time at her house each day to check on her and make sure that she had regular meals. Thus, decedent depended on petitioner and respondent, each of whom provided increased care for her during her final months.
In the four months prior to the execution of her 2018 will, decedent was in declining physical and mental health, including a potential diagnosis of dementia, and spent half that time in medical facilities. During that time, respondent contacted an attorney to draft a new will for decedent and conveyed a sense of urgency. All correspondence with the attorney's office regarding the will was channeled through respondent, who was present throughout the initial meeting and the execution of the will. Although the 2008 will divided decedent's assets equally among her children, the 2018 will differed from that testamentary plan by bequeathing the house and its contents to respondent and his wife. Petitioner, who had power of attorney and handled decedent's financial matters, was not informed regarding the new will until after its execution. When petitioner was made aware of the new will by decedent a few days afterward and read it to decedent, decedent stated that she [*3]did not understand and disputed the contents of the will; when respondent confirmed the meaning of the 2018 will, decedent stated immediately, and a few times thereafter, that "[w]e've got to fix this." Petitioner did not attempt to obtain another will because she questioned decedent's capacity to execute one.
Bank records show that, the day after the 2018 will was executed, someone withdrew a large amount of money from decedent's joint bank account with petitioner. Petitioner denied having made that withdrawal. The record indicates that decedent had not driven in years and, during that time period, she left the house only for medical appointments. The same day as the withdrawal, an equal amount was placed into a certificate of deposit (hereinafter CD) that listed all three children as beneficiaries, the same as decedent's other CDs. Bank records reflect that, a few weeks later, the third sibling's name was removed from the beneficiary designations on decedent's two largest CDs. Respondent testified that he brought decedent to the bank and she signed the CD documents; petitioner disputed that decedent would have left the house at that time. Petitioner testified that, when she discovered the change in CD beneficiaries and confronted respondent, he tried to convince petitioner that she had told him to make the change; petitioner disagreed and told respondent that they needed to add the third sibling back to the CD documents, but respondent repeatedly refused.
Accepting Surrogate's Court's credibility determinations, as it had the advantage of seeing the witnesses and hearing the testimony, the circumstantial proof was substantial and supports the inference of undue influence by respondent. "No single circumstance is dispositive in this regard; rather, it is the confluence of many factors," including the nature of decedent's interactions with both petitioner and respondent, decedent's lack of involvement in her own financial matters at the relevant time and the abrupt and otherwise unexplained change in decedent, culminating in the alteration of her long-standing testamentary disposition shortly after respondent and his wife were observed to take more of an interest in decedent's day-to-day affairs (Matter of Antoinette, 238 AD2d at 763). The record showed decedent's own apparent uncertainty and lack of understanding regarding some of the terms of the 2018 will that she purportedly sought to effect with respondent's assistance, suggesting that the 2018 will did not truly reflect decedent's independent testamentary intentions. Evidence of undue influence is further supported by the fact that respondent made all arrangements for the 2018 will, in relative secrecy, and was present at both the initial meeting with the attorney and the execution of the 2018 will (see Matter of Paigo, 53 AD3d 836, 840 [2008]; see also Matter of Collins, 124 AD2d at 55; compare Matter of Ruhle, 173 AD3d 1389, 1391 [2019]; Matter of Malone, 46 AD3d at 977).
Moreover[*4], shortly after execution of the 2018 will and directly contrary to its testamentary plan — to divide the financial accounts equally among the three children — respondent acted in secrecy to effectuate changes to decedent's financial accounts without including or informing petitioner, who was generally responsible for handling decedent's financial matters. Placing money from decedent's joint account with petitioner into a CD listing all three children as beneficiaries, and removing the third sibling as a beneficiary from two other large CDs, inured to respondent's financial benefit, as did the provision in the 2018 will leaving the house to him and his wife. As noted by Surrogate's Court, "the undisputed facts reveal a distinct pattern" of respondent not acting in decedent's best interest but simply engaging in self-dealing (see Matter of Rosen, 296 AD2d 504, 505-506 [2002]; compare Matter of Zirinsky, 43 AD3d 946, 948 [2007], lv denied 9 NY3d 815 [2007]). Considering the evidence and his confidential relationship with decedent, respondent bore, but failed to overcome, the burden of proving a lack of undue influence (see Matter of Giaquinto, 164 AD3d at 1530; Matter of Boatwright, 114 AD3d 856, 859 [2014]; Matter of Mazak [Nauholnyk], 288 AD2d 682, 684 [2001]; Matter of Connelly, 193 AD2d at 603). We find no error in Surrogate's Court's conclusions that the evidence does not support conflicting inferences and that the 2018 will was the result of undue influence by respondent. Under the circumstances, respondent's close family relationship to decedent did not negate the presumption of undue influence, as his actions were consistent with a motive of greed, rather than family duty (see Matter of Boatwright, 114 AD3d at 859; see also Matter of Antoinette, 238 AD2d at 764; compare Jacks v D'Ambrosio, 69 AD3d 574, 575 [2010]).
Clark, Aarons and Colangelo, JJ., concur.
ORDERED that the order is affirmed, with costs.