■ In the Matter of the Estate of JOHN A. D'AGOSTINO, Deceased. MARY RAIMOND, as Executor of JOHN A. D'AGOSTINO, Deceased, Appellant; RALPH RAIMOND, Respondent. (And Another Related Proceeding.) [728 NYS2d 234] —Mercure, J. P. Appeals (1) from a decree of the Surrogate's Court of Sullivan County (LaBuda, S.), entered March 15, 2000, which granted petitioner's application in proceeding No. 1 to expunge from the last will and testament of decedent all references to respondent as a residuary legatee and as an alternate and successor executor, and (2) from a decree of said court, entered March 15, 2000, which granted petitioner's application in proceeding No. 2 to recover certain estate assets illegally converted by respondent.

Petitioner and respondent were previously married but their marriage ended in July 1995 in what petitioner described as "a very bitter divorce." They have two adult children, Laura Crowley and Janet Chati. On May 23, 1996, petitioner received word from Bell Atlantic that her brother, John A. D'Agostino (hereinafter decedent), was trying to reach her on the telephone. At that time, petitioner had not seen decedent for many years. Petitioner and decedent had become estranged from one another over the disposition of their father's estate—petitioner was appointed executor of the estate, while decedent was disinherited for failing to repay a loan—and they had no contact at all from 1977 to a chance encounter at a shopping center in 1992. After 1992, the two merely exchanged cards and letters a few times each year.

Petitioner called the telephone number that the Bell Atlantic representative gave her and she reached decedent at a Veterans Administration hospital. Decedent told petitioner that he had cancer, that he had been placed in a psychiatric facility, that he was very unhappy there and that he wanted to be released. He also asked petitioner to contact respondent and request that he pick up decedent's car, which was in the park-

ing lot at the Castle Point Veterans Administration hospital, and drive it to decedent's home. Petitioner told decedent that she could not do that because she was divorced from respondent. Petitioner nonetheless got word to respondent through Chati and, after initially indicating that he would expect compensation for his efforts, respondent went to the hospital on May 28 or 29, 1996, visited decedent and picked up the car. In the meantime, petitioner arranged for decedent's transfer back to the Castle Point hospital, where he could receive treatment for his cancer, and she visited decedent there on June 3, 1996.

Decedent knew that his illness was terminal and he was anxious to execute a will and a power of attorney. Petitioner and decedent discussed decedent's various relatives and those who might be appropriate beneficiaries of his approximately $300,000 estate. Decedent was adamant about excluding his own son because "he was in drugs," and petitioner expressed the opinion that no disposition should be made to decedent's nephew, Raymond Bavaro, because Bavaro and his wife were both working, they had no children to support or to send to college, Bavaro owned a boat and home and was looking to buy a summer home, and he was also antisocial and not "a good family member." Decedent was discharged from the hospital shortly thereafter and petitioner had no contact with him until after his readmission on June 24, 1996.

After decedent returned to his home, which was a crude filthy shack that lacked even running water, his neighbor, Miklos Csak, looked after him. On June 13, 1996, Csak took petitioner to the office of Jay Zeiger, an attorney specializing in trusts and estates, in order to have a will and a power of attorney prepared. Among the background information obtained by Zeiger were references to petitioner and respondent, whom Zeiger believed to be petitioner's husband. Except for the money on deposit in some "in-trust-for" accounts, which decedent made clear should pass outside his estate, decedent directed that his entire estate be distributed in equal shares to petitioner, Chati, Crowley and Csak. Petitioner was to be appointed as decedent's executor and respondent his alternate executor. Finally, at Zeiger's recommendation, decedent executed a power of attorney naming petitioner as his attorney-in-fact. Arrangements were made for decedent to return later that day to execute the completed documents, but he never appeared.

A few days later, Csak became concerned about decedent's condition and contacted respondent. Respondent went to visit

decedent at his shack on June 17, 1996 and, on June 18, 1996, respondent returned with his wife, Helen Raimond, expecting to take decedent to the hospital. Respondent introduced his wife as such to decedent, who responded, "Well, you son of a gun, you married twice like I did." Respondent was unwilling to go to the hospital, so the three just visited for an hour or so and ate sandwiches that respondent and his wife had brought.

Respondent and his wife made similar visits on June 19, 20, 22 and 24, 1996. On June 21, 1996, respondent took decedent to Zeiger's office. Decedent told Zeiger that he wanted to change his will by eliminating the 25% residuary legacy to Csak and substituting respondent in his place. In redrafting the will, Zeiger identified respondent as petitioner's husband but did so only because it was his practice to set forth a party's relationship whenever possible and he understood respondent to be petitioner's husband. At the time of the June 21, 1996 visit to Zeiger's office, decedent executed the will, which was later admitted to probate. Finally, at the time of the June 24, 1996 visit by respondent and his wife to decedent's shack, decedent requested that they drop him off at the Castle Point hospital. Respondent and his wife visited decedent at the hospital on approximately four or five subsequent occasions.

Petitioner went to visit decedent in the hospital on June 29, 1996 and again on July 5, 1996. On the latter occasion, as petitioner was about to leave, decedent took a bag out of his night table drawer and gave it to petitioner, stating: "In this bag is my will. I made you my executor and I'm leaving you and your family $100,000." He also stated that he wanted petitioner to take some money out of two trust accounts and put it in his checking account, which was the only account in his own name. In the bag was a note from decedent to petitioner stating: "The in trust at the bank grew out of hand. 50% of the total amount will be better for them—which will put $50,000 in the Kitty 'Raimond.' "

Petitioner decided to see attorney Mario Marino about some changes to her own will, and she brought along the power of attorney and will she had received from decedent for Marino's review. At petitioner's request, Marino drafted a codicil to decedent's will, which recited that decedent was unaware that petitioner had divorced respondent and therefore amended the will so as to leave the residuary estate to petitioner, Crowley and Chati, and eliminate the testamentary disposition to respondent. On July 13, 1996, petitioner visited decedent in the hospital. During the course of the visit, petitioner presented the codicil to decedent who, according to petitioner, stated that

he had been unaware that petitioner and respondent were divorced. After listening to petitioner's enumeration of respondent's many heinous acts during their marriage, decedent agreed to "fix the will and take [respondent's] name out as soon as [he felt] better." Petitioner nonetheless went to the nurses' station and hospital waiting room in order to enlist attesting witnesses but failed in the effort due, she claimed, to an approaching hurricane. Petitioner made a further effort to have decedent execute the codicil on July 18, 1996 but, by the time she returned from locating a hospital social worker to serve as an attesting witness, decedent was asleep. Even after decedent was awakened, the social worker concluded that he was in no physical shape to sign the codicil. Decedent died before a further effort could be made.

Accompanied by Chati, an area locksmith and his girlfriend, petitioner traveled to decedent's shack on July 16, 1996 to remove decedent's personal papers and bankbooks. She was unable to locate the bankbook for a Totten trust for the benefit of Bavaro (hereinafter the Bavaro trust). Further discussion with decedent at the time of petitioner's July 18, 1996 visit tended to confirm the existence of such a bankbook, so petitioner returned to the shack for a further search, which also proved fruitless. It is undisputed that respondent had already taken possession of the bankbook and subsequently delivered it to Bavaro, who closed out the account on August 20, 1996. The final balance in the account, including accrued interest, was $103,535.94.

Following her qualification as executor, petitioner commenced various proceedings in Surrogate's Court[1] seeking (1) to eliminate the will's references to respondent, either as testamentary beneficiary or alternate executor, because of decedent's established intent to include only petitioner's husband or on the basis of respondent's undue influence or fraud surrounding the execution of decedent's will (proceeding No. 1), and (2) to recover from respondent and Bavaro one half of the value of the Bavaro trust, based upon their conversion of the passbook (proceeding No. 2). Prior to trial, petitioner settled proceeding No. 2 with Bavaro for $35,000. In addition, petitioner renounced her interest in decedent's estate and waived any commissions to which she would be entitled as executor. Following a bench trial and the resolution by Surrogate's Court of numerous evidentiary objections relative to the application of the Dead Man's Statute (CPLR 4519), Sur-

---

1. Inexplicably, the record on appeal contains none of the underlying pleadings.

rogate's Court found that decedent had conditioned the testamentary disposition in favor of respondent upon respondent's status as petitioner's husband, that respondent had secured his interest in decedent's estate through fraud and undue influence, and that respondent had unlawfully converted the Bavaro trust. Surrogate's Court therefore decreed that all references to respondent in decedent's will be expunged and his interest distributed to Crowley and Chati and that respondent pay decedent's estate $69,062.17, constituting one half of the value of the Bavaro trust and prejudgment interest. Respondent appeals.

Initially, we agree with respondent that the record does not support a finding of undue influence or fraud surrounding the execution of decedent's will or that the evidence established decedent's intention to condition the disposition to respondent upon his current marriage to petitioner. In order to void provisions of a will as the product of undue influence, it is the contestant's burden to prove by a fair preponderance of the evidence that the influence used was of a kind that so "overpower[ed] and subjugate[d] the mind of the testator as to destroy his free agency and make him express the will of another rather than his own" (*Matter of Beneway*, 272 App Div 463, 468; *see, Matter of Clapper*, 279 AD2d 730, 732; *Matter of Klitgaard*, 83 AD2d 651). Significantly, "[a] mere showing of opportunity and even of a motive to exercise undue influence [does not constitute prima facie evidence of undue influence] unless there is in addition evidence that such influence was actually utilized" (*Matter of Walther*, 6 NY2d 49, 55; *see, Matter of Fiumara*, 47 NY2d 845; *Matter of Bush*, 85 AD2d 887, 888-889). For its part, a finding of fraud must be supported by clear and convincing evidence (*see, Simcuski v Saeli*, 44 NY2d 442, 452; *Matter of Evanchuk*, 145 AD2d 559, 561; *see generally, Abrahami v UPC Constr. Co.*, 224 AD2d 231, 233) that the " 'proponent knowingly made a false statement that caused decedent to execute a will that disposed of his property in a manner different from the disposition he would have made in the absence of that statement' " (*Matter of Clapper, supra*, at 732, quoting *Matter of Coniglio*, 242 AD2d 901, 902).

Finally, the law is well settled that the testator's intent guides the interpretation and construction of will provisions (*see, Matter of Carmer*, 71 NY2d 781, 785), which must be construed "according to their ordinary and natural meaning" (*Winter v American Parkinsons Disease Assn.*, 85 NY2d 715, 719). "The facts and circumstances of the will's framing may be used to discern intent, and, if the will as a whole evidences a

dominant purpose or plan for distribution," the will must be read in accordance with that plan (*Matter of Carmer*, *supra*, at 785-786 [citation omitted]; *see*, *Matter of Flyer*, 23 NY2d 579, 584; *Matter of Fabbri*, 2 NY2d 236, 240). Notably, conditions are not favored, and the courts will avoid a construction imposing a condition upon a gift unless the intent to do so clearly appears. Thus, since conditions are not favored in law, they are construed strictly, and generally all doubts are resolved against restrictions on the use of the property of the grantee. "As between two reasonable constructions of a will, that which makes a gift absolute rather than conditional will be preferred" (39 NY Jur 2d, Decedent's Estates, § 961, at 501; *see*, *Matter of Johnston*, 277 App Div 239, 241, *affd* 302 NY 782; *Matter of Gaffers*, 254 App Div 448, 452-453; *Matter of Folsom*, 142 NYS2d 144, 146).

Here, the ultimate conclusions of Surrogate's Court regarding respondent's fraud and undue influence and decedent's intention to create a conditional disposition are primarily predicated upon the language of decedent's will, respondent's presence at the time of its execution and its findings that respondent failed to disclose to decedent that he had been divorced from petitioner and that respondent made efforts to ingratiate himself to decedent "as though a devoted family member." In her brief, petitioner points to nothing more, except for the fact that decedent was "infirm" and "sickly" at the time that he executed his will. In our view, the essential facts as alleged by petitioner and adopted by Surrogate's Court have scant support in the record and do not in any event warrant the conclusions reached and decree rendered by Surrogate's Court.

First, the greater part of the trial evidence supports a finding that, at the time that decedent executed his will, he was aware that petitioner and respondent had been divorced. As earlier noted, in her initial telephone conversation with decedent on May 23, 1996, petitioner told decedent that she could not arrange to have respondent pick up his car because she and respondent were divorced. In our view, petitioner's subsequent rationalization that decedent likely did not hear this solitary fragment of the conversation is entirely unconvincing in view of the absence of evidence that decedent failed to hear any part of any of the many other conversations that were testified to at the hearing. In addition, as already noted, Raimond stated without contradiction that she had been introduced to decedent as respondent's wife and that she accompanied respondent to decedent's shack and conversed with

decedent on three separate occasions prior to decedent's execution of his will.

Second, although it was Zeiger's recollection that decedent had told him at their June 13, 1996 meeting that respondent was petitioner's husband, he later acknowledged that he "might have been told" that they were at least separated. Significantly, there was nothing in Zeiger's interview notes to show that the two were married except for a cryptic arrow drawn from petitioner's name to respondent's name. In any event, whatever information Zeiger obtained about respondent's relationship to decedent was merely the product of his longstanding practice of ascertaining beneficiaries' and fiduciaries' relationships to the prospective testator. Clearly, any familial relationship that respondent had with decedent sprang out of his marriage to petitioner, regardless of whether that marriage was a subsisting one.

Even more critical, Surrogate's Court's finding, and petitioner's oft-repeated but entirely unsupported claim,[2] that "Zeiger read the material provisions of the will aloud to [decedent]—including Articles 'Third' and 'Fifth' naming [respondent] as 'my sister's husband' to insure that such provisions accurately set forth [decedent's] wishes and intent" is directly contradicted by Zeiger's disinterested hearing testimony. In point of fact, Zeiger stated that on June 21, 1996 he had decedent review the initial draft of the will, which made no disposition to respondent, while Zeiger was in the process of seeing to the requested substitution of respondent for Csak. To the best of Zeiger's recollection, decedent did not review the will after the change was made but relied upon Zeiger's representation that only that one change had been made. Zeiger specifically stated, "I don't recall giving him a copy to read or reading the language to him." His testimony also made it clear that decedent's intention was to benefit respondent and that respondent's relationship to decedent (as Zeiger, and not necessarily decedent, understood it to be) was included in the will only because of Zeiger's policy of stating a party's relationship whenever known.

The record also fails to support petitioner's many accusations concerning respondent's purported efforts to ingratiate himself to decedent. It must be remembered that, at the time of decedent's hospitalization in May 1996, he had lived as a hermit for many years and had completely lost contact with

---

**2.** Petitioner's lengthy statement of facts is supported by only occasional references to the record on appeal and frequently justifies respondent's characterization of it as "for the most part, self-serving fiction."

the beneficiaries of the three existing Totten trusts[3] and the four residuary beneficiaries of his June 21, 1996 will. Under the circumstances, any party who was aware of decedent's terminal illness and began assisting him during the final months of his life could be labeled an opportunist trying to secure a portion of decedent's estate. In fact, although her real intentions can never be known for certain, the record contains considerable evidence supporting a finding that petitioner herself manipulated decedent in order to gain a substantial share of his estate for herself and her daughters and, in furtherance of her extreme animosity toward respondent, to deprive respondent of any interest in the estate.

Notably, despite the fact that, on June 13, 1996, decedent had made very clear that the Totten trusts for Bavaro and Dominick Lepore, each of which he knew to contain approximately $100,000, were to pass to those beneficiaries outside his estate, a mere three weeks later and after frequent contact with petitioner, he decided to apply half of that money to enhance the "Kitty 'Raimond.'" Then, despite the fact that petitioner had been instructed to take $50,000 from each of the accounts, when she could not locate the passbook for the Bavaro account, she took a full $100,000 from the Lepore account, returning half of that money only after decedent directed her to do so and she was reassured of the existence of the Bavaro account. Finally, without any prior discussion with decedent, petitioner took it upon herself to have her own personal attorney prepare a codicil eliminating the testamentary disposition in favor of respondent, but not reinstating the one in favor of Csak. She then made substantial, but ultimately unsuccessful, efforts to induce decedent to execute the codicil. It is noteworthy, we think, that petitioner had the codicil with her during a visit she made to Zeiger, but chose to keep it a secret and told him nothing of her intention to have decedent execute it.

For his part, it appears that prior to the execution of decedent's will, respondent did nothing but pick up decedent's car at the Castle Point hospital, visit with decedent at his shack and in the hospital on a number of occasions, bring him food, water and clothing and take him to his lawyer's office to sign a will. There is no evidence in the record that any of these acts were done in an effort to "ingratiate" respondent to decedent or to cause decedent to make a testamentary disposition in his favor. Our view of the evidence is that, at the very most, petitioner established an opportunity and motive on respondent's part to effect a disposition in his favor, which falls

---

3. In fact, one of those beneficiaries had already died.

far short of establishing undue influence (*see, Matter of Fiumara*, 47 NY2d 845, *supra*). The record contains even less evidence to support a finding that decedent intended to impose any condition on the disposition to respondent or that it was induced by fraud.

In view of the foregoing, and exercising our authority in a nonjury trial to " 'grant the judgment which upon the evidence should have been granted by the trial court' " (*Carter v State of New York*, 194 AD2d 967, quoting *Mesick v State of New York*, 118 AD2d 214, 219, *lv denied* 68 NY2d 611; *see, Osland v Supnick*, 202 AD2d 712, *lv denied* 83 NY2d 758), we find that petitioner failed in proceeding No. 1 to establish by the requisite standard of proof either undue influence, fraud or decedent's intention to make a disposition in favor of respondent only if he was currently married to petitioner.

Turning briefly to the appeal from the decree granting petitioner's application in proceeding No. 2 to recover certain estate assets illegally converted by respondent, we are not persuaded that Surrogate's Court exceeded its authority in prohibiting respondent from offering testimony concerning a statement purportedly made by decedent regarding respondent's disposition of the Bavaro passbook (*see*, CPLR 4519; *Matter of Wood*, 52 NY2d 139). The court's decree shall be modified, however, by deducting from petitioner's damages the $35,000 paid by Bavaro in settlement of the proceeding against him, thereby granting the decree that was specifically sought by petitioner. The parties' remaining contentions either have been rendered academic by our determination, are unpreserved or have been considered and found to be unavailing.

Carpinello, Mugglin, Rose and Lahtinen, JJ., concur. Ordered that the decree in proceeding No. 1 is reversed, on the law and the facts, without costs, and petition dismissed. Ordered that the decree in proceeding No. 2 is modified, on the law, without costs, by reducing the award of damages, exclusive of interest, from $51,635.25 to $16,635.25, and, as so modified, affirmed.