■ In the Matter of the Estate of Louis ROSEN, Deceased. WARREN SILVERMAN, Appellant; HYMAN ROSEN et al., Respondents. [747 NYS2d 99] —In a contested probate proceeding, the proponent appeals from a decree of the Surrogate's Court, Kings County (Feinberg, S.), dated September 14, 2000, which, after a nonjury trial, denied probate of the purported will.

Ordered that the decree is affirmed, with costs payable by the proponent personally.

The decedent, Louis Rosen, a retired New York City Transit Authority employee, was an active and successful investor, and he left an estate valued at approximately $7,000,000. He never married and had no children. In a will executed in October 1988, the decedent left his residuary estate in equal shares to his sister Miriam Silverman (hereinafter Miriam), his brother

Hyman Rosen (hereinafter Hyman), the two children of his deceased brother Irving Rosen, and Miriam's three children (hereinafter Warren, Karen, and Richard). The will revoked a 1986 will which had included, as equal residuary beneficiaries, the two children of his deceased brother Nathan (hereinafter Ronald and Shelly) and which had named Ronald as executor. In the 1986 will, Karen had received only a $100 bequest.

Miriam was named executor in the 1988 will, but she died in 1991. The decedent died in 1992 at age 87. Warren, the successor executor, offered the 1988 will for probate, and Hyman, Ronald, and Shelly filed objections. Following a nine-day non-jury trial, the Surrogate denied probate of the will on the grounds that the will was the product of undue influence exerted by Miriam and that the decedent lacked testamentary capacity.

The determination by the Surrogate that the 1988 will was the product of undue influence was not against the weight of the evidence. Undue influence "can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the conditions of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person" (*Matter of Anna,* 248 NY 421, 424 [internal quotation marks omitted]; *see also Matter of Bach,* 133 AD2d 455; *Matter of Collins,* 124 AD2d 48).

The evidence credited by the Surrogate established that Miriam exerted control over the decedent's finances in the spring of 1988, which was about the same time that other witnesses observed that the decedent, who previously lived very independently and took an avid interest in his investments, began to show personality changes. His personal hygiene declined, his apartment was in disarray and smelled of urine, and his financial records were uncharacteristically in disorder. Also in May 1988, the decedent opened at least one new bank account for which Miriam had the authority to sign checks. Miriam thereafter wrote checks, which the decedent signed, transferring several hundred thousand dollars from his bank accounts into this new account and another account. Miriam subsequently wrote checks to her children from the funds in these accounts, totaling approximately $10,000 each, allegedly based on tax advice from the decedent's accountant and bank manager. However, the Surrogate concluded that such advice was never given. Although the decedent had retained his personal friend and attorney, David Susser, to draft his previ-

ous three wills, his 1988 will was drafted by a new attorney recommended by Miriam's husband.

Between May 1988 and January 1989, the decedent became severely malnourished and, in effect, was on a starvation diet. This malnourishment would be a cause of the decedent's disorientation, which was noted in a medical examination in January 1989. There was expert testimony that the decedent's medical records supported a diagnosis of progressive dementia in early 1989, which would explain the personality changes observed in the spring of 1988. The decedent was hospitalized in early 1992, where he was diagnosed with advanced dementia, and a conservator was appointed shortly before his death in 1992.

The evidence established that Miriam's daughter Karen had virtually no relationship with the decedent, and while she was bequeathed only $100 under the 1986 will, she became an equal residuary beneficiary under the 1988 will. Of his siblings, the decedent maintained the most contact with his brother Nathan, who died in 1986. However, Nathan's children, Ronald and Shelly, who were named as equal residuary beneficiaries under the decedent's previous wills, were omitted as residual beneficiaries under the 1988 will.

Considering these facts and circumstances, particularly the decedent's weakened physical condition and personality changes at the time the will was executed, and the control Miriam had assumed over his finances, there was sufficient evidence to establish that the 1988 will was the result of "a subtle, but pervasive, form of coercion and influence, by which [Miriam] overwhelmed and manipulated decedent's volition to advance her own interests" (*Matter of Antoinette*, 238 AD2d 762, 763; *see also Matter of Itta*, 225 AD2d 548).

Finally, the Surrogate properly considered events which occurred after the execution of the will as relevant in determining the issue of undue influence (*see Matter of Steinhardt*, 228 AD2d 685). Before Miriam's involvement in his financial affairs, the decedent had given only small gifts to his relations. In addition to the large outright gifts to her children which Miriam made from the decedent's accounts, in January 1990, the decedent set up a joint account with right of survivorship in Miriam's three children to which he transferred approximately $1.5 million from his other accounts. Thus, as the Surrogate found, there was sufficient evidence not only that Miriam had a motive and opportunity to exercise undue influence, but that such influence was actually utilized (*see Matter of Walther*, 6 NY2d 49, 55; *Matter of D'Agostino*, 284 AD2d 857, 861).

In light of our determination that the Surrogate properly denied probate of the 1988 will on the ground of undue influence, we need not address the issue of whether the decedent lacked testamentary capacity. We have considered appellant's remaining contentions and find them to be without merit. Feuerstein, J.P., S. Miller, O'Brien and Cozier, JJ., concur.